IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE BOTTLE COFFEE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> HUI CHUAN LIAO, et al., <br><br> Defendants. | Case No. 21-cv-06083-CRB <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE TESTIMONY OF JILL MORTON** |

Plaintiff Blue Bottle Coffee, LLC owns two registered trademarks for Pantone 2995 C—a shade of blue—as used for certain coffee services and products.  Plaintiff brought suit against Defendants Hui Chuan Liao and Southern Technologies, LLC alleging trademark infringement of these marks, among other claims for relief.  Defendants now seek to exclude the testimony of one of Plaintiff's experts, Jill Morton, a "color consultant," as unreliable, irrelevant, and prejudicial.  The Court GRANTS the motion with respect to Morton's statement that there is a likelihood of confusion between Plaintiff's and Defendants' products.  The Court DENIES the motion in all other respects.

## I.    BACKGROUND

### A.    Factual History

Plaintiff Blue Bottle Coffee, LLC is a coffee business founded in 2002 in Oakland, California.  See FAC (dkt. 32) ¶ 14.  It both owns café locations and sells "'pour-over'

coffee, cold brew coffee, pour-over coffee makers, filters, coffee pour-over drippers, coffee grinders, carafes, and glasses, and subscription-based coffee services" online, through retail stores, and in cafés.  Id. ¶¶ 15, 17.

Plaintiff holds multiple registered trademarks, including two marks that consist solely of a shade of blue, Pantone 2995 C, as used for specific classes of services: class 43 ("Cafe, coffee shop, coffee bar, coffee house, and snack-bar services; coffee supply services for offices in the nature of provision of beverages; restaurant services") for Reg. No. 6,244,868, and class 30 ("Coffee; coffee based beverages; ground and whole bean coffee; prepared coffee and coffee-based beverages; prepared espresso and espresso-based beverages; cocoa; cocoa based beverages") for Reg. No. 6,224,867 (collectively, the "BLUE BOTTLE BLUE Marks").  See FAC Ex. 6.   Plaintiff also holds registered word and design trademarks (the "BLUE BOTTLE Marks"), see FAC Ex. 5, and claims trade dress in its product packaging ("BLUE BOTTLE Trade Dress"), see FAC ¶¶ 46–52.  The BLUE BOTTLE Trade Dress includes: (i) use of the word "Blue"; (ii) pervasive use of the BLUE BOTTLE BLUE Marks (Pantone 2995 C); (iii) a silhouette of product shown predominantly; (iv) a silhouette of product shown in white and blue color combination; and (v) square-shaped product packaging.  See FAC ¶ 46.

Plaintiff alleges that Defendant Southern Technologies, LLC and Defendant Hui Chuan Liao, an alleged managing member of Southern Technologies, LLC, began using the name "Blue Brew" in 2017 to sell "'high quality premium coffee gear and accessories.'"  FAC ¶¶ 11, 53. Defendants allegedly sell pour-over coffee makers, filters, coffee pour-over kettles, coffee pour-over drippers, coffee grinders, carafes, and glasses through its website and other online storefronts such as Amazon and eBay.  See id. ¶¶ 54,

57.  Plaintiffs allege that "Defendants are improperly using an identical or nearly identical shade of blue to the BLUE BOTTLE BLUE Mark and the word 'blue' on its product packaging to advertise and sell its products, including use of the highly similar brand name BLUE BREW."  Id. ¶ 55.

## B.    Procedural History

Plaintiff filed suit on August 6, 2021, and filed an amended complaint on November 30, 2021.  See Comp. (dkt. 1); FAC.  The amended complaint includes fifteen causes of action, seven of which Plaintiff dismissed with prejudice on December 7, 2022.  See FAC; Stip. and Consent to Dismiss (dkt. 68).  The remaining causes of action are: (1) trademark infringement of the BLUE BOTTLE Marks and BLUE BOTTLE BLUE Marks under § 32(1) of the Lanham Act; (2) unfair competition, false endorsement, false association, and false designation of origin under § 43(a)(1)(A) of the Lanham Act, for use of the BLUE BOTTLE and BLUE BOTTLE BLUE marks; (3) trademark cancellation of the BLUE BREW trademark registration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201; (4) federal trade-dress infringement of the BLUE BOTTLE trade dress under 15 U.S.C. § 1125(a); (4) unfair competition under Cal. Bus. Prof. Code §§ 17200; and (5) unfair competition, trade dress infringement, and trademark infringement under California common law for the BLUE BOTTLE Marks, BLUE BOTTLE BLUE Marks and BLUE BOTTLE Trade Dress.  FAC ¶¶ 79–267.

On April 7, 2023, Plaintiff served three opening expert reports from: (i) Jeffrey S. Andrien; (ii) Norman Broadhurst; and (iii) Jill Morton.  See P's Mot. to Strike (dkt. 117) at 5.  On May 22, 2023, Plaintiff provided updated versions of each report.  See id. at 6.

Defendants deposed Ms. Morton on July 20, 2023.  See Opp'n (dkt. 132) Ex. 1.  On

August 11, 2023, Defendants filed the instant Daubert motion to exclude the testimony of

Ms. Morton.  See Mot. (dkt. 127).  The motion is fully briefed.  The Court held a motion

hearing on October 6, 2023.  See Transcript (dkt. 167).

**C.**     **Jill Morton's Testimony**

Jill Morton's expert report includes the following assertions.  Morton is the CEO of

Colorcom, a consulting firm that "specializes in helping companies understand how to use

color most effectively."  P's Mot. to Strike Ex. 9 ¶ 3 (hereinafter, "Morton Rpt.").  Her

firm "consults with companies . . . regarding the role of color, brand identity, corporate

image, product and packaging design, trademarks and logos, website and user interface

design, architecture, and interior design, among other things."  Id. ¶ 1.  Morton received a

Bachelor of Fine Arts from the University of California, Santa Barbara, where she also

completed a fifth year of study in the Graduate School of Education (and received a "fifth-

year certificate in art education as a result of that one year of graduate school.").  See id. at

16; Mot. Ex. 1 at 50:20–51:1.  She also received a Master of Fine Arts in design from the

University of Hawaii.  See Morton Rpt. at 16, ¶ 5.  Plaintiff's counsel asked her to: (1)

provide background on the sensory effects of color as it relates to brand identity; (2)

analyze the blue colors used by Plaintiff and Defendants; and (3) provide an opinion on the

impact of the Defendants' "actions on consumers in the marketplace."  Id. ¶ 7.  Based on

her analyses, she came to the following three conclusions: (1) the color blue is a "key,

source identifying attribute of the BLUE BOTTLE brand"; (2) the color blue used by

Defendants is "similar or nearly identical"  to the color blue used by Plaintiff; and (3) the

United States District Court
Northern District of California

combined effect of Defendants' use of a "nearly identical color blue and the word 'Blue'"" would cause consumers to be confused about the source of and/or association between the two parties and their products and brands.  Id. ¶ 11.  The Court summarizes her discussion of these conclusions below.

### 1.    Plaintiff's Blue is Source-Identifying

Morton first states that companies often use color to "communicate something" to consumers.  Id. ¶ 12.  Such communication "conveys characteristics of a product or product line."  Id.  For example, bottled water companies' use of blue or blue-green may convey the "purity" of the product and connection to blue bodies of water.  Id. ¶ 13.  Color can also connect consumers to a brand arbitrarily; for example, the color brown "is arbitrary in relation to UPS's services," as is T-Mobile's magenta color.  Id. ¶ 14.

Morton states that "[c]onsumer perceptions of brands are stored in consumers' memory," and connections between experiences of colors are formed in the "associated networks that provide robust models of people's memory for descriptive and general knowledge" resulting in "psychological effects."  Id. ¶ 16.  When selecting colors for branding, "companies consider existing associations between a given color and the goods or services being offered."  Id. ¶ 17.  For example, while the color blue is "not typically found in naturally occurring foods," companies may incorporate it where blue is an associated color, such as for berries or water, "to communicate sweetness or fruitiness, or evoke associations with cooling waters or icebergs."  Id.

However, based on Morton's "experience consulting with companies regarding the role of color in brand identity, corporate image, and product and packaging design, blue

5

has limited pre-existing associations with naturally occurring foods." Id. ¶ 18.  Because

coffee is "typically served as some shade of brown," the BLUE BOTTLE BLUE Marks

"do not describe any aspect of, or perform a function of or for, any of the BLUE BOTTLE-

brand services or products." Id.  Rather, like the UPS brown or T-Mobile magenta, the

Marks "serve as branding elements that help create an association in consumers' minds"

between the Marks and Plaintiff's brand, services and products.  Id.

> **2.      Defendants' blue is "similar or nearly identical" to Plaintiff's blue**

Morton next states that the shade of blue Defendants use on their packaging,

Pantone 305 C, is a "nearly identical" shade of blue to the Blue Bottle Blue Marks,

Pantone 2995 C.  Id. ¶ 19.  In order to "gauge the similarities" between Plaintiff's and

Defendants' use of blue, and to "assist the jury" in evaluating such similarities, Morton

first conducted a "Pantone color analysis."  Id. ¶ 22.   Pantone is a company and "system[]

for classifying colors" that develops "mixing formulas" for colors.  Id. ¶¶ 22–24.  Morton

first lists the color "breakdown" of ingredients for Pantone 2995 C (Blue Bottle Blue) and

Pantone 305 C (Defendants' blue) based on the Pantone "Color Guide."  Id. ¶ 26.   The

colors each have varying degrees of Pantone Pro Blue and Pantone Transparent White,

which "determine[s] the degree of lightness for each color."  Id. ¶ 27.  Although Pantone

2995 C (Blue Bottle Blue) has a "relatively small percentage" of Pantone Ref Blue, it

shares "identical ingredients" with Pantone 305 C (Defendants' Blue) in the Pantone Pro

Blue and Pantone Transparent White, and the shades of blue are thus "similar or nearly

identical."  Id. ¶ 27.

Morton also conducted a CMYK analysis.  Id. ¶ 28.  CMYK is a "color formula

system for printing materials." Id.  Because all printers use only cyan, magenta, yellow, and black, varying percentages of the colors are used to create a given shade of blue.  Id. ¶ 29.  Morton compared the CMYK formulas, based on a Pantone Guide ("Color Bridge by Pantone") and found that Plaintiff's and Defendants' shades "both contain mostly cyan, and very small amounts of other colors."  Id. ¶ 32.  Morton also analyzed two additional unrelated shades of blue that, in contrast, contain much more magenta and black.  Id.

### 3.      The marks are likely to be confused

Given Morton's findings in (1) and (2), as well as "Blue Bottle's longstanding use of its BLUE BOTTLE BLUE Marks," the "combined effect of the BLUE BREW brand's use of a nearly identical color on its package and using the word 'blue' in its name" is that it "likely is misleading and could cause customers to believe or otherwise associate that BLUE BREW brand's products as having come from Blue Bottle (or vice versa) when encountered in the marketplace."  Id. ¶ 34.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 requires that (a) an expert's scientific, technical, or other specialized knowledge help the trier of fact; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593–94 (1993).

In Daubert, the Supreme Court "charged trial judges with the responsibility of

United States District Court
Northern District of California

acting as gate-keepers to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" United States v. Finley, 301 F.3d 1000, 1007–08 (9th Cir. 2002) (quoting Daubert, 509 U.S. at 589). The Court "articulated a two-step inquiry for determining whether scientific evidence or testimony is admissible." Id. at 1008. First, the trial court must assess reliability, making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. (quoting Daubert, 509 U.S. at 592–93). Reliability requires that the testimony is rooted in "a reliable basis of knowledge and experience of the relevant discipline." Kumho Tire v. Carmichael, 526 U.S. 137, 150 (1999). Second, "the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact." Finley, 301 F.3d at 1008. Expert testimony helps the trier of fact "when it provides information beyond the common knowledge of the trier of fact." Id.

Daubert discussed several reliability factors, including whether the expert's theory or technique has been tested; whether it "has been subjected to peer review and publication"; the "potential rate of error" of a particular scientific technique; and general acceptance in the relevant scientific community. Daubert, 509 U.S. at 593–94. Cases since Daubert have made clear that the district court's gatekeeper function applies to all expert testimony, not just testimony based in science. See Kumho Tire, 526 U.S. at 147. In addition, the reliability inquiry is a flexible one; courts have "broad latitude to determine" what factors, if any, are relevant to the reliability determination. Id. at 150, 153. The proponent of the expert testimony bears the burden of showing admissibility by a preponderance of the evidence. Fed. R. Evid. 104(a); Bourjaily v. United States, 483 U.S.

171, 175 (1985).

A judge assessing expert testimony under Rule 702 "should also be mindful of other applicable rules." Daubert, 509 U.S. at 595.  For example, Federal Rule of Evidence 706 allows the court to procure, at its discretion, the assistance of an expert of its own choosing.  Id.  In addition, Federal Rule of Evidence 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Id.

## III.   DISCUSSION

Defendants seek to exclude Morton's testimony, arguing that: her testimony will not be helpful to a jury; her opinions are not based on sufficient facts or data; she did not employ reliable principles and is not qualified to offer opinions in this case; her testimony is not relevant under Federal Rule of Evidence 401, and any probative value is outweighed by unfair prejudice under Federal Rule of Evidence 403.  See Mot.  These arguments essentially track the requirements of Rule 702, which Daubert summarized as requiring reliability and relevance.  See Mot. at 7 ("The trial judge's task is to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting Daubert, 509 U.S. at 597).  For example, Defendants' first argument that Morton's testimony will not be helpful to a jury—which Defendants only raise regarding Morton's second and third assertions, see Mot. at 5—is "encompassed in the determination of whether expert testimony is relevant," see Cooper v. Brown, 510 F.3d 870, 942 (9th Cir. 2007) (citation omitted).  To the extent that Defendants further argue that the testimony is irrelevant under Federal Rule of Evidence 401 and prejudicial under Federal Rule of

Evidence 403, the Court also address these arguments in the "relevance" inquiry.[1]  Below, the Court considers the reliability and relevance of each of Morton's three conclusions and her corresponding analyses: (A) the color blue is a source-identifying attribute of Plaintiff's brand, (B) the color blue that the parties use in connection with their brands is "similar or nearly identical"; and (C) the combined effect of the color blue and the word "blue" on Defendants' products would cause consumer confusion with Plaintiff's products.

### A.    Plaintiff's Blue is Source Identifying
### 1.    Reliability

Expert opinion testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010) (quoting United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006)).  When it comes to the "reliability of non-scientific testimony . . . the Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1016–17 (9th Cir. 2004) (internal quotation omitted) (concluding that an expert's "significant knowledge of an experience

---

[1]  Rule 401 provides that "relevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Daubert, 509 U.S. at 587 (citing F. R. Evid. 401).  Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Id. (citing F. R. Evid. 403).  Defendants argue that "[a]llowing Ms. Morton to state speculative and generalized conclusions lacking any foundation or applicability to the specific facts of the case, would confuse the issues and mislead the jury." Mot. at 7.  The Court addresses this argument in assessing reliability.

within the insurance industry" provided "at least the minimal foundation" required to speak to the practices and norms of insurance companies regarding a bad faith claim).

Jill Morton has a degree in Art Education, see Morton Rpt. at 16, an MFA in design, and over twenty years of experience as a "brand identity expert," see id. ¶ 5. She has "taught courses about color at universities and colleges for over 20 years," including a "graduate-level course about the psychological and physiological effects of color at the University of Hawaii School of Architecture" and classes titled "Color Theory" and "Organic Color Symbolism." Id. ¶¶ 4, 16. As Rule 702 "contemplates a broad conception of expert qualifications," the Court finds that Morton is qualified to provide testimony regarding Plaintiff's use of the color blue as a source-identifier. See Hangarter, 373 F.3d at 1018 (quoting Thomas v. Newton Int'l Enterprises, 42 F.3d 1266, 1269 (9th Cir. 1994)).

Defendants argue that Morton's qualifications are unreliable because she is "acting as a color psychologist" despite not holding "a degree in psychology, medicine, or any type of science" or publishing any peer-reviewed papers. Mot. at 1. Defendants state that "there is no doubt Ms. Morton purports to testify about psychology even though she has absolutely no basis to." Reply at 7. Defendants point to another case, SafeRack, LLC v. Bullard Co., No. 2:17-cv-1613-RMG (D. S.C. Nov. 26, 2018), in which the court excluded Morton's testimony for this same reason. See Mot. at 3. The court there held that because Morton "holds no degrees in psychology, optometry, or any science," nor was there an indication of "acquired knowledge in any of these fields," she lacked the qualifications to speak about how humans would "perceive" different colors. Id.

However, Morton stated in this case that she "refer[s] to [herself] as a 'color

consultant' with an expertise in how consumers interact with colors, where 'color psychology is a general term.'" Mot. Ex. 1 at 55:23–56:2. Further, as Plaintiff points out, Morton offered very different testimony in SafeRack than she is offering here. See Reply at 13–14. The SafeRack court stated that, "[i]n reaching her conclusions, Morton routinely relies on the psychological effects colors have on individuals. For instance, '[o]range is the most common psychological signal that triggers a 'cautionary' reflex.'" Mot. Ex. 334 at 4. In this case, Morton only discusses psychology to the extent that it contextualizes what brands consider when selecting colors for goods or services, an exercise with which Morton has significant experience. See Morton Rpt. ¶ 17 ("In selecting colors for branding, companies consider existing associations between a given color and the goods or services being offered."). Moreover, she cites to an article in a peer-reviewed journal for her claim that "Consumer memory is often described as associated networks that provide robust models of people's memory for descriptive and general knowledge."[2] Id. ¶ 16. She makes no claims, as she did in SafeRack, about the "biophysics of vision," nor do her scientific conclusions "rely on Wikipedia articles." See Gyarfas Decl. (dkt. 127) Ex. 334 at 4. Rather, Morton relies on her "experience consulting with companies regarding the role of color in brand identity, corporate image, and product and packaging design" to describe what companies consider in selecting colors for branding, and why she believes Plaintiff's blue is a source-identifying attribute of Plaintiff's products and services.

---

[2] The abstract of the cited article states: "This article introduces a methodology, Brand Concept Maps, for eliciting brand association networks (maps) from consumers and aggregating individual maps into a consensus map of the brand." Deboarah Roedder John et al., Brand Concept Maps: A Methodology for Identifying Brand Association Networks, 43 J. Mktg. Rsch. 549 (Nov. 2006).

Morton Rpt. ¶ 18.

That Morton lists "color psychologist" as her title on her LinkedIn page, see Reply Ex. 1, does not change the nature of her testimony, which is rooted in her marketing experience.  Moreover, that Morton may not be qualified to speak to the study she cites about consumer associations and memory goes to the weight of her testimony rather than its admissibility.  See, e.g., JIPC Mgmt., Inc. v. Incredible Pizza Co., No. CV 08-04310 MMM PLAX, 2009 WL 8591607, at *4 n.10 (C.D. Cal. July 14, 2009) ("There is clearly substantial overlap between [marketing and consumer psychology] . . . and the court concludes that [the expert's] substantial marketing experience qualifies him to testify regarding consumer behavior in relation to trademarks.  The fact that he may not be specifically trained or experienced in consumer psychology, as opposed to marketing, goes to the weight of his testimony rather than its admissibility.").

Defendants also argue that Morton's testimony is unreliable because she did not rely on consumer survey information, "failed to interview any Blue Bottle employees about their advertising strategies," and spoke to no one about their association of the brand with something else.  Mot. at 2.  "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Lucido v. Nestle Purina Petcare Co., 217 F. Supp. 3d 1098, 1102 (N.D. Cal. 2016) (citing Fed. R. Evid. 702, 2000 advisory committee's notes).  Again, Morton based her opinion on her experience advising brands on color and consumer association.  See Morton Rpt. ¶ 18 ("[B]ased on my experience consulting with companies regarding the role of color in brand identity, corporate image, and product and packaging design, blue has limited pre-existing associations with naturally occurring foods. . . . Based on the same, the BLUE BOTTLE BLUE Marks, when used on

and in connection with the BLUE BOTTLE brand's services and coffee-related products, do not describe any aspect of . . . any of the BLUE BOTTLE-brand services or products."); see also 3M Co. v. Rollit, LLC, No. C 06-01225 JW, 2007 WL 9728892, at *2 (N.D. Cal. Sept. 28, 2007) ("To the extent that [the expert] relied on his own knowledge or experience in coming to his opinion, he need not cite factual support for those opinions in his report."). That Morton did not conduct a consumer survey or interview Blue Bottle employees goes to the weight, not admissibility of her testimony. See Bergen v. F/V St. Patrick, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987), opinion modified on reh'g, 866 F.2d 318 (9th Cir. 1989) (citing Taenzler v. Burlington Northern, 608 F.2d 796, 798 n.3 (8th Cir.1979)) ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility."); see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969 (9th Cir. 2013) ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

## 2.    Relevance

Relevance "means that the evidence will assist the trier of fact to understand or determine a fact in issue." Cooper v. Brown, 510 F.3d 870, 942 (9th Cir. 2007). To prevail on a trademark infringement claim, a claimant must show that: (1) it has a valid, protectable mark, and (2) the allegedly infringing use of the mark is likely to cause confusion. See Applied Info. Scis. Corp. v. eBAY, Inc., 511 F.3d 966, 969 (9th Cir. 2007). "The threshold issue in any action for trademark infringement is whether the words used by a manufacturer in connection with his product are entitled to protection." Id. (quoting

United States District Court
Northern District of California

Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir.1985)).

Plaintiff has a valid, protectable mark if: (1) it has a federally registered mark; (2) it has a

suggestive mark; or (3) its mark, while merely descriptive, has acquired a secondary

meaning in the market.  Id. at 969–70.  While registration on the Principal Register—

which Plaintiff obtained for both BLUE BOTTLE BLUE marks, see FAC Ex. 6—serves as

prima facie evidence of the validity of the mark, it is rebuttable if the mark has not yet

achieved uncontested status.[3]  See Applied Info. Scis. Corp., 511 F.3d at 970.  To establish

secondary meaning, "a manufacturer must show that, in the minds of the public, the

primary significance of a product feature or term is to identify the source of the product

rather than the product itself."  Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc., 456 U.S. 844, 851

n.1 (1982).  That a color serves some other function beyond identifying the source of the

product is relevant to the analysis of secondary meaning.  See Qualitex Co. v. Jacobson

Prod. Co., 514 U.S. 159, 166 (1995).

      Here, Morton's discussion about arbitrary and functional product colors, and her

corresponding opinion about Plaintiff's use of blue, is relevant to the trademark

infringement inquiry.  Her testimony about the functionality of blue as used on a coffee

product would assist a jury in understanding or evaluating the validity of the marks.

Defendants contest the relevance of this part of Morton's report only to the extent that

Defendants state that "the relevance of blue in naturally occurring foods remains

---

[3] In Defendants' recent motion for summary judgment, Defendants challenged the validity of Plaintiff's marks.  See MSJ (dkt. 136) at 18 n.2 ("[W]hile the registration carries a presumption of secondary meaning, this presumption is rebuttable if Defendants establish, as Defendants do here, that secondary meaning has not attached and the marks are not entitled to trademark protection.").

unexplained."[4]  Reply at 10–11.  However, debatable statements do not provide a sufficient basis to exclude helpful testimony.  See Alaska Rent-a-Car, 738 F.3d at 969–70 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be useful to the jury.").  Further, Morton's statements are not so unreliable that they would "confuse the issues and mislead the jury," as Defendants argue.  See Mot. at 7.  In sum, because a jury will have to decide whether the marks have achieved secondary meaning in the minds of the public, Morton's testimony about the source-identifying nature of Plaintiff's marks is relevant.

**B.    Defendants' blue is "similar or nearly identical" to Plaintiff's blue**

**1.    Reliability**

Morton explains her conclusion that Defendants' use of blue on packaging is "nearly identical" to that used on Plaintiff's packaging by conducting Pantone and CMYK analyses.  Morton Rpt. ¶¶ 21–22.  She states that she is an "expert" in both and has "20 years of experience of what consumer eyes see in reference to Pantone and CMYK colors."  Opp'n Ex. 1 at 40, 140.  Defendants primarily contest the reliability of her use of CMYK analysis, given that Plaintiff "cites nothing to establish that Ms. Morton's peculiar CMYK analysis has been peer reviewed or ever been previously accepted as a reliable methodology."  Reply at 11.  Defendants emphasized this point again at the motion hearing.  Morton states that she utilized the CMYK analysis as a way to "translate" and

---

[4]  Morton states: "While the color blue is not typically found in naturally occurring foods, companies considering branding in the limited places where blue is an associated color (e.g., berries, bottled water) might incorporate blue in order to communicate sweetness or fruitiness, or evoke associations with cooling waters or icebergs."  Morton Rpt. ¶ 17.

United States District Court
Northern District of California

United States District Court
Northern District of California

"confirm[]" the Pantone color makeup and similarities she saw.  Opp'n Ex. 1 at 111.  She performed no "mathematical analysis" but simply provided commentary about the CMYK breakdown of four different shades of blue—Plaintiff's, Defendants' and two similar seeming colors—based on formulas from Pantone.  Id.

Again, in certain fields, experience may be the predominant basis for reliable expert testimony.  See Lucido, 217 F. Supp. 3d at 1102.  Morton conducted the analyses based on twenty years of experience working with the techniques, to elucidate why the two colors in question may "look similar to the human eye."  Morton Rpt. ¶ 25.  Further, especially in a relatively niche area like the role of color in branding, her experience and explanation of her methods suffice.  See Primiano, 598 F.3d at 565 ("Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature.  Lack of certainty is not, for a qualified expert, the same thing as guesswork."); see also Daubert, 509 U.S. at 594 ("The fact of publication (or lack thereof) in a peer reviewed journal . . . will be a relevant, though not dispositive, consideration.").  To the extent that Morton's analysis is unreliable in some other way, cross-examination is the appropriate avenue for Defendants to attack it.  See Daubert, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

**2.    Relevance**

Morton stated that she conducted the two color analyses to "assist the jury in evaluating the similarities" of the marks.  Morton Rpt. ¶ 21.  "Similarity of marks" is one

of eight factors relevant to establishing likelihood of confusion, see AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 349 (9th Cir. 1979), so there is clearly a "connection" between Morton's analysis and the trademark infringement inquiry at hand.  See Primiano, 598 F.3d ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.").  Defendants argue that Plaintiff never identifies why jurors would need a "framework" to simply compare two colors, because "[o]ne does not need to be a 'color psychologist' to see the obvious differences between Plaintiff's BLUE BOTTLE BLUE Marks and the colors used by Defendants."  Reply at 9.  Though Morton admitted that eight jurors who have "passed some color vision test" would be "just as capable as I am to compare the two colors in question," her testimony is more than just a side-by-side comparison.  Id. at 4.  She speaks to the ingredient breakdown of the two Pantone colors because, among other reasons, Plaintiff's trademark registrations specifically claim Pantone 2995 C.  See FAC Ex. 6.  To bolster her analysis and highlight an additional way to think about the similarity of colors, she "translate[s]" the Pantone ingredients into ink makeups for printing.  See Opp'n Ex. 1 at 111.

While jurors can evaluate the similarity of colors themselves, it may be useful to them to learn about the nuance of color and color ingredients from the perspective of a professional color consultant.  Expert testimony assists jurors when the subject matter at issue is "beyond the common knowledge of the average layman," see Finley, 301 F.3d at 1008, but courts also "must be cautious not to overstate the scope of the average juror's common understanding and knowledge," id. at 1013.  Here, an average juror is not likely familiar with Pantone as a color system, nor with the way color formulations might inform the similarity or dissimilarity of colors.

The Court holds that Morton may provide a framework of color interpretation for jurors and analyze the similarities of Plaintiff's and Defendants' shades of blue based on her experience as a color consultant.

### C.   The marks are likely to be confused
#### 1.   Reliability

Morton relies on "Blue Bottle's longstanding use of its BLUE BOTTLE BLUE Marks, the combined effect of the BLUE BREW brand's use of a nearly identical color on its packaging[,] and using the word 'blue' in its name" to conclude that it "likely is misleading and could cause consumers to believe or otherwise associate the BLUE BREW brand's products as having come from Blue Bottle (or vice versa) when encountered in the marketplace." See Morton Rpt. ¶ 34. Defendants complain that "Ms. Morton is not aware of any instances of actual consumer confusion." Mot. at 3. That is not necessarily problematic. See Monster, Inc. v. Dolby Lab'ys Licensing Corp., 920 F. Supp. 2d 1066, 1072 (N.D. Cal. 2013) (survey evidence may not be necessary to show likelihood of confusion). Even so, Morton has no apparent experience analyzing consumer confusion from either a legal or marketing perspective. See Morton Rpt.; Mot. Ex. 1. Despite Morton's valid analysis of the colors themselves, what Morton did to come to her likelihood of confusion conclusion is essentially a side-by-side comparison. Yet, "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." Levi Struss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822 (9th Cir. 1980). Particularly, "[a] side-by-side comparison is improper if that is not the way consumers encounter the product in the market." AirWair Int'l Ltd. v. Pull & Bear Espana SA, No. 19-CV-07641-SI, 2021 WL

2914082, at *4 (N.D. Cal. July 12, 2021) (holding that because Plaintiff's products were only sold on their own website, a side-by-side comparison was improper and that part of the expert testimony should be excluded). Here, Defendants' products are allegedly sold on their website as well as other third party storefronts such as Amazon and eBay. See FAC ¶ 57. Although Plaintiff also sells products on third party storefronts such as Amazon and eBay, see id. ¶ 21, neither Morton nor Plaintiff provide any support for why side-by-side comparison would be a reliable test to establish a likelihood of consumer confusion. Even if they had, the testimony does not assist the jury, as discussed below.

## 2. Relevance

Though an opinion "is not objectionable because it embraces an ultimate issue," see Fed. R. Evid. 704(a), an expert witness "cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." Nationwide Transp. Fin. v. Cass Info. Sys., Inc., 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting Hangarter, 373 F.3d at 1016).[5] While likelihood of confusion is often a question of fact, see One Industries, LLC v. Jim O'Neal Distributing, Inc., 578 F.3d 1154, 1162 (9th Cir. 2009), the Court nevertheless agrees with Defendants that Morton's testimony on this issue will not assist the trier of fact. See Mot. at 1. In fact, because her determination is based on her personal observations of the marks, her testimony would usurp the role of the jury as a factfinder. See, e.g., Lanard Toys Ltd.

---

[5] Federal Rule of Evidence 704(a) "specifically abolished" the "unduly restrictive" ultimate issue rule of older cases. Fed. R. Evid. 704 advisory committee's note. Yet "[t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions." Id. Provisions such as Rule 702 "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach . . . . They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria." Id.

United States District Court
Northern District of California

v. Anker Play Prod., LLC, No. CV 19-4350-RSWL-AFMX, 2020 WL 6873647, at \*7

(C.D. Cal. Nov. 12, 2020) ("The Court excludes [the expert's] opinions regarding

trademark infringement and likelihood of confusion because these opinions would not

assist the trier of fact."); JIPC Mgmt., Inc., 2009 WL 8591607, at \*4 (permitting an expert

"to testify regarding the characteristics of relevant consumers, but not to opine on the

ultimate likelihood of confusion between the parties' marks.").

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the motion as to Morton's testimony

that there is a likelihood of confusion between Plaintiff's and Defendants' products, and

DENIES it in all other respects.

**IT IS SO ORDERED.**

Dated:  October _16_ , 2023

_____
CHARLES R. BREYER
United States District Judge