United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BLUE BOTTLE COFFEE, LLC,

       Plaintiff,

    v.

HUI CHUAN LIAO, et al.,

       Defendants.

Case No. 21-cv-06083-CRB

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

In this trademark case, Plaintiff Blue Bottle Coffee brought suit against Defendants Hui Chuan Liao and Southern Technologies, LLC in connection with Defendants' sale of coffee-making products using the name "Blue Brew." Compl. (dkt. 1). The parties have filed cross-motions for summary judgment. See P MSJ (dkt. 185) (redacted) and (dkt. 187-3) (unredacted); D MSJ (dkt. 184) (redacted) and (dkt. 183-2) (unredacted). As explained below, the Court DENIES Blue Bottle's motion and GRANTS Defendants' motion.

I.  **BACKGROUND**

    A.  **Blue Bottle**

Blue Bottle sells "super-premium coffee and related goods." Cha Decl. (dkt. 139) ¶ 6. It is "a global leader in what is now known as the 'third wave' coffee industry." Id. "Founder James W. Freeman started Blue Bottle in Oakland, California in 2002," offering premium coffee out of coffee carts at the Oakland Farmer's Market, Berkeley Farmer's Market, and the San Francisco Ferry Building Farmer's Market. Id. ¶ 7. "Blue Bottle offered premium coffee to consumers, primarily in the San Francisco Bay Area, who

1   sought an alternative to then-prevailing coffee offerings." <u>Id.</u>  Over time, Blue Bottle

2   expanded to include coffee kiosks and cafes in the Bay Area.  <u>Id.</u> ¶ 11.

3           Blue Bottle now sells its goods at brick and mortar cafes in major U.S. cities.  <u>Id.</u> ¶

4   21; ███████████████.  It sells packaged coffee at grocery stores such as Wal-

5   Mart, Safeway, Target and Whole Foods.  ████████████[1]  It also sells products on

6   its own website, bluebottlecoffee.com, and on Amazon.com, Wal-Mart, and Target.com.

7   <u>Id.</u> Exs. █, 27, 28, 29.

8           From its inception in 2002, Blue Bottle used its company name, "Blue Bottle

9   Coffee," and combined the "BLUE BOTTLE" word mark with a distinctive light shade of

10  blue that has come to be called "BLUE BOTTLE BLUE," also known as Pantone shade

11  2995 C.  Cha Decl. ¶¶ 8, 9.  For example, this a BLUE BOTTLE Mark that Blue Bottle

12  used in 2008, and it features the BLUE BOTTLE BLUE color:



20  <u>See</u> FAC (dkt. 32) Ex. 5 at 16.  Freeman selected the "particular shade of blue" that he did

21  because "it embodied the blue color mixture between the San Francisco sky and the water

22  in the San Francisco Bay present in the month of October."  Cha Decl. ¶ 13.  In 2008, he

23  chose Pantone 2995 C as the closest approximation of that color.  <u>Id.</u>  Blue Bottle has used

24  Pantone 2995 C continuously from 2008 to the present.  <u>Id.</u> ¶ 17.

25           Blue Bottle is a global business that has achieved ███████████████

26  ███.  <u>See</u> Alsterlind Decl. (dkt. 138) ¶¶ 1–3.  Blue Bottle "spends millions of dollars

27  _____

28  [1] This document was filed under seal, but this information is unredacted in Blue Bottle's
    motion.  <u>See</u> P MSJ at 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

advertising its goods and services," and nearly every ad contains the BLUE BOTTLE Marks and the BLUE BOTTLE BLUE Marks.  Cha Decl. ¶ 18; see also id. ¶ 19 ("From 2008–2023, Blue Bottle's marketing and advertising budget has grown exponentially along with the revenues generated from the sales of Blue Bottle's goods and services.").  Blue Bottle also "considers its brick and mortar cafes an advertising component of [its] brand." Id. ¶ 21.  It "has seventy-eight cafes throughout the United States," which "prominently display the BLUE BOTTLE Marks and the BLUE BOTTLE BLUE Marks on the décor, the hard goods sold, the coffee pour over kits used to brew customer[s'] coffee, and on external signboards." Id.  Blue Bottle advertises through social media, enters into co-branding agreements with "other premium brands," and receives unsolicited media attention. Id. ¶¶ 22–25.  It also periodically conducts "ethnographic interviews of its customers" about its branding. Id. ¶¶ 27–28.

### B.    Blue Brew

Defendant Southern Technologies sells coffee gear and accessories under the BLUE BREW brand.  de Gyarfas Decl. Ex. F (Liao Depo.) (dkt. 184-7) at 29:14–18.  Defendant Liao founded Southern Technologies in 2007 and is its 95% owner.  Id. at 33:4–8.  She also owns the BLUE BREW Mark.  de Gyarfas Decl. Ex. M (Blue Brew trademark) (dkt. 184-14).  Liao launched the BLUE BREW brand in 2017 after she and her husband visited the Canton Fair trade show in China, where they "saw many coffee products . . . and . . . felt that these tools or gears should have a market."  de Gyarfas Decl. Ex. F at 26:12–27:21.

Liao testified that she came up with the "Blue Brew" name because she knew about the Blue Mountains of Jamaica—"'Blue' means Blue Mountain, and 'brew' means—Blue Brew sounds like the sound when one's boiling water, and you put the two words together, it sounds like 'blue brew.'"  de Gyarfas Decl. Ex. F at 56:6–17; see also id. at 85:18–86:9 (referencing Blue Mountain coffee).  The logo on the Blue Brew packaging, and particularly the B in the word blue, signifies the Blue Mountains, which are known for their coffee beans.  See id. at 120:13–18 ("the letter B in our logo, the shape of the top

portion of the letter resembles the shape of a mountain."); de Gyarfas Decl. Ex. E (Cha Depo.) (dkt. 184-6) at 50:20–25 (recognizing that the Blue Mountains are a place in Jamaica where coffee is grown).  Defendants use the color Pantone 305 C on their product packaging.  de Gyarfas Decl. Ex. F at 75:16–19.  Liao testified that when she was designing the packaging for Blue Brew, the color she had in mind was Tiffany Blue.  Id. at 64:2–25.  She "wanted to show [her] designer that the color that [she] would like to have should have a little blue and a little green in it."  Id.

Some examples of Defendants' logo are as follows:



Defendants only offer their products online.  de Gyarfas Decl. Ex. F at 104:23–105:3 ("We sell on Amazon, Walmart, our own website, and also eBay.").

**C.    Asserted Trademarks**

Two different sets of Blue Bottle trademarks are at issue in this case.  The first are the BLUE BOTTLE word marks (for "Blue Bottle Coffee" and "Blue Bottle Coffee Co."), and the second are the BLUE BOTTLE BLUE color and design marks.  Cha Decl. ¶ 18; FAC ¶¶ 28–29,[2] Exs. 5, 6.  The BLUE BOTTLE Marks achieved registration on the Principal Register of the USPTO on various dates, from January 1, 2013 to June 8, 2021, based on a first use date of August 15, 2002.  FAC Ex. 5.  The BLUE BOTTLE BLUE Marks achieved registration on the Principal Register of the USPTO on various dates, from

---

[2] These paragraphs of the FAC list the asserted marks, registration numbers, registration dates, and classes.  See id.

January 1, 2013, to December 22, 2020, also based on a first use date of August 15, 2002.
Id.; id. Ex. 6 ("The color(s) blue (Pantone 2995 C) is/are claimed as a feature of the
mark").  On January 1, 2013, Blue Bottle obtained a trademark registration for the logo it
used to launch the brand, which includes both the BLUE BOTTLE Mark and the BLUE
BOTTLE BLUE color.  Id. Ex. 5 at 16.

### D.   Asserted Trade Dress

Blue Bottle's trade dress looks like this:

  

**Figure 1**

FAC ¶ 47.  Blue Bottle has articulated its asserted trade dress in a few different ways.  See
D MSJ at 4–6; P Opp'n (dkt. 194-3)[3] at 3.  Most recently, it asserted that "One manner in
which Plaintiff uses the BLUE BOTTLE Trade Dress is through the following five
elements: '(i) use of the word 'Blue' (i.e., 'Blue Bottle'); (ii) pervasive use of the BLUE
BOTTLE BLUE Marks (Pantone 2995 C); (iii) a silhouette of product shown
predominantly; (iv) a silhouette of product shown in white and blue color combination;
and (v) square-shaped product packaging."  P Opp'n at 3 (quoting FAC ¶¶ 46–47).  It also
asserted that "another manner in which Blue Bottle uses its trade dress is the unique

---

[3] At the motion hearing, the Court asked Blue Bottle to correct its citation to a particular
piece of evidence in Blue Bottle's opposition brief, as the citation was incorrect.  See Tr.
of 4/29/24 (dkt. 208) at 5:15–20.  Blue Bottle submitted an Errata not only identifying the
correct citation for that piece of evidence, but purporting to make fifteen other changes to
its opposition brief.  See Errata (dkt. 205).  As Defendants point out, that "went far
beyond" what the Court requested, and unfairly leaves Defendants with no opportunity to
respond.  See Objection (dkt. 206).  Accordingly, the Court will only take note of the
correction it asked Blue Bottle to make.

combination of (i) 'Blue'—formative wording (including, without limitation, 'Blue Bottle') and/or (ii) the BLUE BOTTLE BLUE Marks (Pantone 2995 C)." Id.; Objections to Second Supp. Response to Interrogatory 1 (dkt. 160-2) at 8.

### E.    Assignment of Trademarks

On July 15, 2021, Blue Bottle assigned all of its rights to the BLUE BOTTLE and BLUE BOTTLE BLUE Marks to Nestle.  de Gyarfas Decl. Ex. S (Trademark Assignment) (dkt. 184-17).  Blue Bottle transferred not only the entire trademark rights and goodwill associated therewith, but also "the right to sue for and collect upon all claims for profits and damages as a result of past infringement." Id. at 5.  Blue Bottle acknowledges that it is no longer the registrant or owner of the subject trademarks, but asserts that it is the exclusive licensee as to all of the trademarks asserted in this action.  See P Opp'n at 6–7 (citing Young Decl. Ex. 43 at 10:21–11:23); see also FAC at 7 n.3 (alleging assignment and exclusive licensee status).

### F.    Alleged Infringement

In 2017, Liao filed a trademark application for the BLUE BREW in connection with "[p]ower operated machines, namely, coffee grinders, agitators for circulating liquid media, mixing machines, electric mixers, salt and pepper mills for household purposes other than hand operated."  FAC Ex. 9 (Blue Brew Mark).  In July of 2018, Defendants began offering their products—including ceramic coffee drippers, steel pour over coffee drippers, milk frothers, coffee grinders, glass coffee servers, coffee kettles, and carafes. FAC Ex. 11 (Blue Brew Facebook page with sales offerings).  The USPTO granted Liao's trademark application for BLUE BREW on March 3, 2020.  FAC Ex. 9 (Blue Brew Mark). Blue Botte alleges that Defendants use their confusingly similar infringing mark as their "primary brand name, with primary prominence and featuring blue packaging and other materials that are identical and/or confusingly similar" to Blue Bottle's marks.  FAC ¶¶ 58–63.

### G.    Defendants' Intent

Liao testified about her knowledge of Blue Bottle.  She testified that she ran a

search for "Blue Brew" on Google before deciding to use the name, and did not see "any other Blue Brews," nor "Blue Bottle Coffee."  de Gyarfas Decl. Ex. F at 57:15–58:2. 59:14–17.  Sometime between mid-2017 to mid-2018, having seen an ad for Blue Bottle online, Liao visited Blue Bottle's website.  Young Decl. Ex. 6 (dkt. 185-7) at 91:4–92:22–24.  When Liao applied for a Blue Brew trademark in 2017, she was not aware that Blue Bottle had trademark registrations.  Id. at 95:8–14.

Liao also testified about choosing Blue Brew's color.  A June 2017 email Liao sent to a designer in response to some proposed logos stated: "I like the light blue more than dark blue, maybe more modern color.  Reference Blue bottle coffee."  de Gyarfas Decl. Ex. 3 (dkt. 184-21) (6/13/17 email from Liao to Sandra Alutyte).  Liao testified that "[t]hat day I happened to see the Blue Bottle. . . . I had my mind set on light blue so I told her  . . . to look at Blue Bottle as a reference for what I wanted, which is the light blue."  Young Decl. Ex. 9 (dkt. 185-10) at 31:13–20.  She then clarified: "what I meant by the reference was instructing her to not use that blue anymore."  Id. at 32:10–12; see also id. at 33:1–2 ("what I meant by the reference is to tell her not to use that blue.").  A July 2017 email Liao sent to the designer stated: "We finally settled on one design.  Can you please change the e a little bit?  Also, can you make the color of ocean blue and some other blues except bottle blue's blue?"  de Gyarfas Decl. Ex. 4 (dkt. 184-22).

### H.    Harm to Blue Bottle

Blue Bottle's ██████ and Chief Branding Officer both testified that they could not identify any actual harm or lost sales based on Defendants' conduct.  ████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ de Gyarfas Decl. Ex. D (dkt. 184-5) at 40:21–23 (re harm: "I'm personally not aware."), 40:24–41:12 (re lost sales: "I'm not aware.").

### I.    Procedural History

Blue Bottle first learned of Defendants and the BLUE BREW mark when the USPTO cited the BLUE BREW mark against one of Blue Bottle's applications for BLUE

United States District Court
Northern District of California

BOTTLE COFFEE. ███████████████████████████ Blue Bottle had sought the mark in connection with "[m]ugs; glass mugs; travel mugs; insulated containers for food or beverages; tumblers for use as drinking gasses; coffee dripper for brewing coffee; coffee filters; carafes; non-electric coffee dripper for brewing coffee; non-electric kettles."  Young Decl. Ex. 12 (dkt. 185-13) (6/13/2019 Blue Bottle trademark application). On April 7, 2020, the USPTO preliminarily refused registration of the BLUE BOTTLE Mark on the ground that it was confusingly similar to the BLUE BREW Mark that Liao registered in March 2020.  Young Decl. Ex. 13 (dkt. 185-14) at 4 ("Here, 'BLUE BOTTLE COFFEE' and 'BLUE BREW' are similar in that the first terms of the marks are the identical terms 'BLUE'"; "applicant's and registrant's goods are considered related for likelihood of confusion purposes.").

On October 7, 2020, Blue Bottle filed a petition for cancellation of the BLUE BREW Mark before the Trademark Trial and Appeal Board ("TTAB") based on the USPTO's determination that there was a likelihood of confusion.  Young Decl. Ex. 35 (dkt. 185-36).  The same day, Blue Bottle requested that the refusal of its application be suspended pending the outcome of its petition for cancellation.  Young Decl. Ex. 14 (dkt. 185-15) at 5–6.  The USPTO granted that request.  Young Dec. Ex. 15 (dkt. 185-16).

On August 6, 2021, Blue Bottle filed the initial complaint in this case, bringing numerous causes of action in connection with the BLUE BOTTLE Marks and the BLUE BOTTLE BLUE Marks.  Compl.  After this action was filed, TTAB granted Blue Bottle's motion to suspend the cancellation proceeding pending final disposition of this case. Young Decl. Ex. 16 (dkt. 185-17).  Blue Bottle filed an amended complaint on November 30, 2021.  See FAC.  The FAC includes causes of action for: (1) trademark infringement under Section 32(1) the Lanham Act as to the BLUE BOTTLE Marks; (2) unfair competition, false endorsement, false association, and false designation of origin under Section 43(a)(1)(A) of the Lanham Act as to the BLUE BOTTLE Marks; (3) trademark infringement under Section 32(1) of the Lanham Act as to the BLUE BOTTLE BLUE Marks; (4) unfair competition, false endorsement, and false designation of origin under

Section 43(a)(1)(A) of the Lanham Act as to the BLUE BOTTLE BLUE Marks; (5) trademark cancellation under the Federal Declaratory Judgment Act as to BLUE BREW; (6) federal trade-dress infringement under 15 U.S.C. § 1125(a) as to the BLUE BOTTLE Trade Dress; (7) federal trademark dilution under 15 U.S.C. § 1125(c) as to the BLUE BOTTLE Marks; (8) federal trademark dilution under 15 U.S.C. § 1125(c) as to the BLUE BOTTLE BLUE Marks; (9) violation of the Anti-Cybersquatting Consumer Protection Act under Section 43(a) of the Lanham Act; (10) Federal Trade-Dress Dilution under 15 U.S.C. § 1125(c) as to the BLUE BOTTLE Trade Dress; (11) unfair competition under Cal. Bus. & Prof. Code § 17200; (12) trademark dilution under Cal. Bus. & Prof. Code § 14247 as to the BLUE BOTTLE Marks; (13) trademark dilution under Cal. Bus. & Prof. Code § 14247 as to the BLUE BOTTLE BLUE Marks; (14) trade-dress dilution under Cal. Bus. & Prof. Code § 14247 as to the BLUE BOTTLE Trade Dress; (15) unfair competition, trade dress infringement, and trademark infringement under California common law as to the BLUE BOTTLE Marks, BLUE BOTTLE BLUE Marks, and BLUE BOTTLE Trade Dress.  See FAC.  Blue Bottle later dropped claims 7–10 and 12–14.  See Stip. (dkt. 68).

In the remaining claims, Blue Bottle accuses Defendants of trademark infringement, unfair competition and related California state law and common law claims as to the BLUE BOTTLE and BLUE BOTTLE BLUE Marks, see FAC (claims 1–4, 11, and 15), as well as trade dress infringement, see id. (claim 6), and it seeks cancellation of the BLUE BREW Mark, id. (claim 5).

The parties have now filed cross-motions for summary judgment.  P MSJ; D Opp'n (dkt. 191); P Reply (dkt. 200); D MSJ; P Opp'n; D Reply (dkt. 199).

## II.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the [moving] party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

"[W]hen parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'"  Housing Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (citation omitted).  "'[T]he filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present.  A summary judgment cannot be granted if a genuine issue as to any material fact exists.'"  Id. (quoting United States v. Fred A. Arnold, Inc., 573 F.2d 605, 606 (9th Cir. 1978)).

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  Id. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of material in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  A triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party.  Anderson, 477 U.S. at 249.  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

It is not a court's task "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (internal citation omitted).

Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." See id. When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.    DISCUSSION

This order addresses the parties' arguments on four main issues: (A) whether Blue Bottle has standing to bring its federal claims; (B) whether there is a likelihood of confusion between the BLUE BOTTLE Marks and the BLUE BREW Mark; (C) whether there is a likelihood of confusion between the BLUE BOTTLE BLUE Marks and the BLUE BREW Mark; (D) whether Blue Bottle has prevailed on its trade dress claim.

### A.    Standing

This order first addresses Defendants' argument that Blue Bottle lacks standing to bring its federal claims. See D MSJ at 10–12.

#### 1.    Section 32 Claims (claims 1 and 2)

"Statutory standing is a threshold element for which [the plaintiff] carries the burden of proof." Knature Co., Inc. v. Duc Heung Grp., Inc., No. CV 20-3877-DMG (AFMx), 2021 WL 2548679, at *4 (C.D. Cal. April 22, 2021). "Only registrants—as statutorily defined—have statutory standing to bring an action under Section 32(1)." Id. at *3 (internal quotation marks omitted); see also 15 U.S.C. § 1114(1).

It is undisputed that Blue Bottle does not own the BLUE BOTTLE and BLUE BOTTLE BLUE Marks, because Blue Bottle assigned its "entire right, title and interest in and to" those marks to Nestle. See de Gyarfas Decl. Ex. S (Trademark Assignment). The assignment included "the right to sue for and collect upon all claims for profits and damages as a result of past infringement." Id. at 5. Blue Bottle acknowledges that it is no longer the registrant or owner of the subject trademarks, but asserts that it is the exclusive licensee as to all of the trademarks asserted in this action. See Young Decl. Ex. 43 (dkt. 185-44) (Alsterlind Depo.) at 10:21–11:23 ("We have an exclusive license in the US

United States District Court
Northern District of California

through SBN, a licensing agreement that allows us to -- the use of mark exclusively in the United States.").  It adds that "[a]s for Defendants' contention that Plaintiff did not produce a license in discovery, Defendants never requested it . . . and, indeed, never mentioned it."  See P Opp'n at 7.  Blue Bottle therefore asserts that "Defendants cannot now complain about Plaintiff's document production, months after the close of fact discovery."  Id.

As an initial matter, the license did come up during discovery.  See de Gyarfas Decl. Ex. T (dkt. 184-18) at 5–6 (Blue Bottle Third Amended Initial Disclosures, stating "Plaintiff may use documents . . . within its possession . . . in the following categories to support its claims in this action: 1. The adoption of and Plaintiff's rights in and to the" Marks).  Defendants requested and Blue Bottle agreed to produce "all documents identified in [Blue Bottle's] Initial Disclosures" that were non-privileged and "within its possession, custody, and control."  See de Gyarfas Decl. Ex. U (dkt. 184-19) (Plaintiff's Objections to Requests for Production of Documents) at 31.  Blue Bottle apparently never produced a license agreement.  See D Reply at 3.  But it would not matter if Defendants had never requested the license agreement during discovery.  The plaintiff "has the burden of providing admissible evidence of its rights to the marks at summary judgment," and whether or not the defendant "request[ed] the evidence in discovery is irrelevant."  Knature, 2021 WL 2548679, at *4.

As to the substance of the parties' disagreement, an exclusive licensee can have standing to bring a claim for trademark infringement, but does not always.  "Standing may exist where the licensing agreement both grants an exclusive license and grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee."  Visa U.S.A. Inc. v. First Data Corp., No. 02-1786 JSW, 2005 WL 6271242, at *3 (N.D. Cal. Aug. 16, 2005) (citing Ultrapure Sys., Inc. v. Ham-let Grp., 921 F. Supp. 659, 665–66 (N.D. Cal. 1996)); see also Upper Deck Co. v. Panini America, 533 F. Supp. 3d 956, 962 (S.D. Cal. April 13, 2021) ("For standing under § 1114, the prevailing approach by district courts in this circuit has been to hold "that standing may exist where

the licensing agreement both [1] grants an exclusive license and [2] grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee."); Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc., No. C 12-05523 WHA, 2013 WL 1007666, at *3 (N.D. Cal. March 13, 2013) (recognizing that "district courts in this circuit generally have" taken this approach).

Blue Bottle has not produced the licensing agreement, and so there is no evidence the Court is aware of that Blue Bottle has a property interest in the relevant trademarks. See also Keenan, 91 F.3d at 1279 (not a court's task "to scour the record in search of a genuine issue of triable fact."). Blue Bottle's assertion that it "is now the exclusive licensee" of the trademarks is insufficient. See P Opp'n at 7[4]; Visa U.S.A., 2005 WL 6271242, at *3 (requiring that "the licensing agreement both grants an exclusive license and grants to the exclusive licensee a property interest in the trademark") (emphasis added). This is particularly so given that the assignment that is in evidence states that Nestle has "the right to sue for and collect upon all claims for profits and damages as a result of past infringement." See de Gyarfas Decl. Ex. S at 5.

Accordingly, the Court holds that Blue Bottle lacks standing to sue under Section 32.

### 2.      Section 43 Claims (claims 2, 4, and 6)

To have standing under Section 43, "'a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's [conduct].'" Knature, 2021 WL 2548679, at *6 (quoting Lexmark Int'l, Inc. v. Statis Control Components, Inc., 572 U.S. 118, 140 (2014)). A non-owner and non-registrant can have standing. In Knature, where the plaintiff pointed to evidence that customers who purchased the defendant's products complained to the plaintiff about the products, the court held that the plaintiff's "business still has a commercial interest in the

---

[4] It also asserts that it "was previously the owner and registrant" of the Marks, id. at 7 n.2, but whether it used to have standing to sue does not tell the Court whether it now has standing to sue.

brand's reputation as an entity that markets and sells branded products." <u>Id.</u>

Here, though, Blue Bottle's ███ and Chief Branding Officer both testified that they could not identify any actual harm or lost sales based on Defendants' conduct. ████████ ███████████████████; de Gyarfas Decl. Ex. D at 40:21–23; <u>see also</u> ████████ ███████████████. Nor is there evidence of actual customer confusion. <u>See</u> de Gyarfas Decl. Ex. V (dkt. 184-20) at 15; de Gyarfas Decl. Ex. E (Cha Depo.) at 123:16– 19. No Blue Bottle consumers or third parties have inquired about ███████████ ████████████████████████████████████████████ ████████████████████ There is no evidence of the kind of reputational harm present in <u>Knature</u>.

Blue Bottle argues that "Plaintiff does not need to show evidence of actual confusion to succeed on a Lanham Act claim." P Opp'n 8.   That is true—the confusion in <u>Knature</u> was just one way that the plaintiff demonstrated harm. <u>See</u> 2021 WL 2548679, at *6 ("Reputational harm of this sort falls squarely within the <u>Lexmark</u> test.").   But Blue Bottle does have to point to <u>some</u> "injury to a commercial interest in sales or business reputation proximately caused by [Defendants'] misrepresentations." <u>See</u> <u>Lexmark Int'l, Inc.</u>, 572 U.S. at 140.   Here, Blue Bottle argues: "Plaintiff also made clear in both its Complaint and its operative First Amended Complaint that it suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct." P Opp'n at 8 (citing Compl. and FAC at 20).   The complaint and the amended complaint are just allegations, though— not evidence.   On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 323.   Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of material in the record." Fed. R. Civ. P. 56(c).   Blue Bottle has not done that.

Accordingly, the Court holds that Blue Bottle lacks standing to sue under Section

43.[5]

### 3.    Cancellation Claim (claim 5)

A petition to cancel a registration of a mark may "be filed . . . by any person who believes that he is or will be damaged, including as a result of a likelihood of dilution by blurring or dilution by tarnishment . . . by the registration of a mark on the principal register." 15 U.S.C. § 1064. "In order to show standing to seek cancellation, a petitioner must show a rational basis for his belief that he would be damaged by the registration sought to be cancelled, 'stemming from an actual commercial or pecuniary interest in his own mark.'" Petroliam Nasional Berhad v. GoDaddy.com, Inc., 897 F. Supp. 2d 856, 870 (N.D. Cal. 2012) (quoting Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 735 F.2d 346, 349 (9th Cir. 1984)), aff'd, 737 F.3d 546 (9th Cir. 2013).

Defendants argue that because of the assignment of the relevant marks to Nestle, "Plaintiff is no longer the owner of the pending trademark application . . . that was refused based on Defendant's BLUE BREW Mark." D MSJ at 12. Defendants continue: "Therefore, there is no actual or potential damage to Plaintiff's own mark." Id. And, Defendants add, it is not even as if Defendants are using the BLUE BREW Mark as a sword against Blue Bottle. Id. (citing Petroliam Nasional Berhad, 897 F. Supp. 2d at 870). Blue Bottle's response is a single sentence: "Plaintiff clearly meets the standing requirement necessary to show it would be harmed by Defendants' registration of the BLUE BREW registration." P Opp'n at 8.

This is a closer question. Blue Bottle does not own the relevant marks, and has not demonstrated that it may sue to protect them. But the Ninth Circuit has agreed that "'the public interest is served . . . in broadly interpreting the class of persons . . . [allowed] . . . to institute cancellation proceedings.'" Star-Kist Foods, Inc., 735 F.2d at 349 (quoting Lipton Indus., Inc. v. Ralston Purina Co., 670 F.2d 1024, 1030 (C.C.P.A. 1982)). The

---

[5] Defendants add that Blue Bottle presented no evidence that it has the right to sue on the asserted trade dress, see D Reply at 3, but it did not make this argument in its opening motion, and so the Court does not reach it.

Circuit explained that "While no absolute test can be laid down for what must be proved, . . . a cancellation petitioner must show he is more than an intermeddler but rather has a personal interest, and that there is a real controversy between the parties." Id. (internal quotation marks and citations omitted). "Examples of what courts have countenanced as reasonable bases are: an assertion of a likelihood of confusion between the petitioner's mark and the registered mark at issue which is not wholly without merit, . . . or . . . a rejection of an application during prosecution." Id. (internal quotation marks and citations omitted). Blue Bottle's arguments for why there is a likelihood of confusion are not wholly without merit, but the relevant marks are not Blue Bottle's marks.

Still, given the lack of an "absolute test" as to standing, the Court is inclined to side with Blue Bottle. "All that is needed is 'a real interest in the outcome of the proceeding beyond the general public.'" Lavco Solutions, Inc. v. Biztracker Sys. of St. John, LLC, No. 2:20-cv-03286-VAP-PLAx, 2020 WL 11648276, at *4 (C.D. Cal. Nov. 4, 2020) (quoting Roxbury Entm't v. Penthouse Media Grp., Inc., No. 2:08CV03872 FMC (JWJx), 2009 WL 2950324, at *3–4 (C.D. Cal. Apr. 3, 2009)). Even in Petroliam Nasional Berhad, the court said that "because Go Daddy is in danger of being financially affected by Petronas['s] assertion of its mark—even though Go Daddy does not meet the traditional qualification of a party that claims a right to use the name in the mark—Go Daddy has arguably established standing." 897 F. Supp. 2d at 870. Here, Blue Bottle "is in danger of being financially affected by" Defendants' use of the BLUE BREW Mark. "'Standing is the more liberal of the two elements and requires only that a party believe that it is likely to be damaged by the registration,'" which "can be shown by a pecuniary interest." Law v. Harvey, No. C 07-00134 WHA, 2007 WL 2990426, at *4 (N.D. Cal. Oct. 11, 2007) (quoting Cunningham v. Laser Golf Corp., 222 F.3d 943, 945 (Fed Cir. 2000)). "[S]tanding does not require that the petitioner have ownership or exclusive control of the mark, but only that he show that the petitioner would be damaged by the registration." Id.

at *5 (citing <u>Wilson v. Delaunay</u>, 245 F.2d 877, 879 (C.C.P.A.1957)).[6]

Here, while Blue Bottle has not established that, as an exclusive licensee, it has the right to bring suit to enforce the marks, it has an interest in the outcome of the proceedings beyond the general public, and might suffer financial harm from the BLUE BREW Mark. Accordingly, the Court concludes that Blue Bottle has standing to sue for cancellation.

### B.      BLUE BOTTLE Marks and the BLUE BREW Mark

This order next addresses Blue Bottle's claims that the BLUE BREW Mark infringes on Blue Bottle's BLUE BOTTLE Marks.[7]

To prevail on a claim for trademark infringement, a plaintiff must demonstrate (1) ownership of a valid trademark and (2) use by defendant in commerce of a mark likely to cause confusion.  See <u>Network Automation, Inc. v. Advanced Sys. Concepts, Inc.</u>, 638 F.3d 1137, 1144 (9th Cir. 2011).  The test for false designation under the Lanham Act, and common law and statutory unfair competition claims under California law, is whether there is a likelihood of confusion.  <u>Walter v. Mattel, Inc.</u>, 210 F.3d 1108, 1111 (9th Cir. 2000).

### 1.      Validity of Blue Bottle's Marks

The first requirement for trademark infringement is ownership of a valid trademark. See <u>Network Automation, Inc.</u>, 638 F.3d at 1144.  Blue Bottle argues that it "owns valid trademark right in each of its BLUE BOTTLE Marks" because it is the exclusive licensee of those marks.  P MSJ at 7, <u>id.</u> n.5.  As discussed above, Blue Bottle has failed to demonstrate that it has an ownership interest in the marks.  See <u>Knature</u>, 2021 WL 2548679, at *4 (the plaintiff "has the burden of providing admissible evidence of its rights to the marks at summary judgment."); <u>see also</u> <u>Halcyon Horizons, Inc. v. Delphi Behavioral Health Grp., LLC</u>, No. 17-cv-00756-JST, 2017 WL 1956997, at *5 (N.D. Cal.

---

[6] <u>Wilson</u> held: "[I]t is well settled that an opposer need not have exclusive rights in a mark in order to oppose its registration to another. . . . It is only necessary that the opposer establish that he would probably be damaged by the registration of an applicant's mark." <u>Id.</u>

[7] This issue determines claims 1, 2, 5, 11, and 15.

May 11, 2017) ("There is no question that the licensing agreement . . . grants Elevate an exclusive license to the . . . Marks. . . . Based on the text of the licensing agreement, however, the Court cannot conclude that it 'grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee.'") (quoting Innovation Ventures, LLC, 2013 WL 1007666, at *5).

If Blue Bottle was able to clear that hurdle, however, there is no dispute that the BLUE BOTTLE Marks are otherwise valid.[8]  The BLUE BOTTLE Marks achieved registration on the Principal Register of the USPTO on various dates, from January 1, 2013 to June 8, 2021, based on a first use date of August 15, 2002.  FAC Ex. 5.  Blue Bottle has continuously used the Blue Bottle Marks in interstate commerce in connection with its goods and services since 2002.  See id. at 2–16.  Two of the BLUE BOTTLE Marks have become incontestable within the meaning of 15 U.S.C. § 1065, which means that they are "conclusively presumed to have acquired secondary meaning."  See KP Permanent Make-Up Inc. v. Lasting Impression I Inc., 408 F.3d 596, 606 (9th Cir. 2005).

### 2.  Likelihood of Confusion

The second requirement for trademark infringement is a likelihood of confusion. See Network Automation, Inc., 638 F.3d at 1144.  There is a likelihood of confusion between two products "when consumers 'are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.'"  Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 825 (9th Cir. 1993) (quoting Metro Publishing, Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993) (abrogated on other grounds)).  The Ninth Circuit analyzes likelihood of confusion by referring to eight factors identified in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir. 1979), abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (2003): (a) strength of the mark; (b) similarity of the marks; (c) proximity of the goods/services sold; (d) similarity in the

---

[8] Defendants do dispute that the BLUE BOTTLE BLUE Marks are valid.  D Opp'n at 6–11.  This order will discuss that issue in Section III.C.1.

United States District Court
Northern District of California

marketing channels used; (e) type of goods/services and degree of care likely to be exercised by purchasers; (f) evidence of actual confusion; (g) defendant's intent in selecting its mark; and (h) likelihood of expansion into other markets.  "[A]lthough these <u>Sleekcraft</u> factors 'channel the analytical process,' they do not necessarily dictate a result." <u>Pom Wonderful LLC v. Hubbard</u>, 775 F.3d 1118, 1125 (9th Cir. 2014) (quoting <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1141 (9th Cir. 2002)).  "Because the factors are 'fluid,' a 'plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.'"  <u>Pom Wonderful</u>, 775 F.3d at 1125 (quoting <u>Surfvivor Media, Inc. v. Survivor Prods.</u>, 406 F.3d 625, 631 (9th Cir. 2005)).

### a.   Strength of the Mark

"The scope of the trademark protection" given a mark "depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones." <u>Entrepreneur Media</u>, 279 F.3d at 1141.  "This is so because a strong mark is 'inherently distinctive,' . . . and therefore it is more likely that consumers will be confused by another's use of the same or similar mark."  <u>Id.</u> (quoting <u>Sleekcraft</u>, 599 F.2d at 349). A trademark's strength "is evaluated in terms of its conceptual strength and commercial strength."  <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1207 (9th Cir. 2000).

### i.   Conceptual Strength

As to conceptual strength, courts are to place a mark on a "continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful[,] awarded maximum protection."  <u>E.&J. Gallo Winery v. Gallo Cattle Co.</u>, 967 F.2d 1280, 1291 (9th Cir. 1992) (cleaned up).  "An arbitrary mark consists of 'common words that have no connection with the actual product," while "the less protected 'suggestive' category requires the exercise of some imagination to associate the mark with the good or service."  <u>Rearden LLC v. Rearden Commerce, Inc.</u>, 683 F.3d 1190, 1211 (9th Cir. 2012).

That Blue Bottle registered the trademarks without being required to prove secondary meaning creates a presumption that the marks are inherently distinctive.  <u>See</u>

United States District Court
Northern District of California

1    Americana Trading, Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1287 (9th Cir. 1992)

2    (holding that registered marks are presumed to be distinctive).  Blue Bottle argues that its

3    BLUE BOTTLE Marks are in fact "arbitrary because the word 'blue' . . . [has] no intrinsic

4    connection to coffee."  P MSJ at 19 (citing Brookfield Commc'ns, Inc. v. West Coast Ent.

5    Corp., 174 F.3d 1036, 1058 n.19 (9th Cir. 1999)).  Blue Bottle repeated that assertion at

6    the motion hearing.  See Tr. of 4/29/24 at 3:16–21.  Defendants' response is that the mark

7    is descriptive, because "blue" suggests the Blue Mountains in Jamaica where some coffee

8    is grown.  See D Opp'n at 13; see also Tr. of 4/19/24 at 4:10–16.  Defendants' Blue

9    Mountains argument is unpersuasive; that those mountains contain the word blue does not

10   mean that the public broadly associates the word blue with coffee.

11        The Court nonetheless rejects the notion that the marks are arbitrary, as they consist

12   of more than just the word "blue."  The BLUE BOTTLE Marks, which are 13 word marks

13   for BLUE BOTTLE COFFEE and two marks for BLUE BOTTLE COFFEE CO., see FAC

14   Ex. 5, all contain the word "coffee," which is the main feature of Blue Bottle's business.

15   See, e.g., Planet Coffee Roasters, Inc. v. Hung Dam, No. SACV 09-00571-MLG, 2010

16   WL 625343, at *4 (C.D. Cal. Feb. 18, 2010) ("The mark 'Planet Coffee Roasters'

17   suggests, rather than describes, an ingredient, quality or characteristic of Plaintiff's

18   business, i.e., that Plaintiff is in the business of roasting coffee.").  A suggestive mark

19   requires the consumer to "use imagination or any type of multistage reasoning to

20   understand the mark's significance"—it "does not describe the product's features, but

21   suggests them."  See Entrepreneur Media, Inc., 279 F.3d at 1141–42 (internal quotation

22   marks omitted).  Here, the words "blue" and "bottle" do not describe the quality or features

23   of the coffee and coffee products that Blue Bottle sells, instead suggesting a clean/pure

24   aesthetic.  Accordingly, the Court considers the BLUE BOTTLE Marks suggestive.  In any

25   case, "[i]n general, fanciful, arbitrary, and suggestive marks receive automatic protection

26   because of their inherent distinctiveness."  Interstellar Starship Svcs, Ltd. v. Epix, Inc., 304

27   F.3d 936, 943 n.6 (9th Cir. 2002).

28                          ii.      **Commercial Strength**

As to commercial strength, courts are to look to "'actual marketplace recognition,'" recognizing that "'advertising expenditures can transform a suggestive mark into a strong mark.'" Network Automation, Inc., 638 F.3d at 1149 (quoting Brookfield Commc'ns, Inc., 174 F.3d at 1058).

Here, Blue Bottle argues that its marks "are commercially strong for the same reasons that they enjoy secondary meaning." P MSJ at 19 (citing P MSJ at 8–13). These are: that Blue Bottle has received news and social media coverage, id. at 10 (citing Cha Decl. Ex. 7) (dkt. 141-20) (Blue Bottle brand and products featured in Forbes, CNN, New York Post, San Francisco Chronicle, Entertainment Tonight, the New York Times, etc.); that Blue Bottle enters into collaborations and co-branding arrangements, id. at 11 (citing Cha Decl. Exs. 5&6) (dkt. 141-18, 141-19) (collaborations with The Weeknd, New Balance, HIDDEN, Michelin, Timbuk2); that Blue Bottle has spent millions of dollars on advertising and marketing, id. at 11 (citing Cha Decl. ¶¶ 18–19); that Blue Bottle has made hundreds of millions in revenue, id. at 12 ███████████████ that it has consistently used the marks for two decades, id. (citing FAC Exs. 5&6; Cha Decl. ¶¶ 8–17); and that its use of the marks has been substantially exclusive, id. at 12–13 ("In the third wave coffee category, Blue Bottle is the only leading company to use its particular shade of blue to market and promote its goods and services.").

Defendants' response is primarily that Blue Bottle's use is not exclusive—that in fact, a number of companies use the word blue in the coffee industry. "Even according to [Blue Bottle], the terms 'BLUE' and 'COFFEE' are found in a significant number of third-party registrations used in connection with coffee and coffee related products." D MSJ at 13 (citing RJN Ex. 171) (Blue Botte Response to Office Action re preliminary refusal) (dkt. 192-2) at 6–9. Defendants also note that their witness, Dr. Fair Wang, testified that numerous other coffee companies use the word blue, including Blue Mountain Coffee, Blue State, Blue Line, Blue Island Coffee, and Blue Ribbon. Id. at 13 (citing de Gyarfas Decl. Ex. G (Wang Depo.) (dkt. 184-8) at 22:16–23:9). Defendants also note that Blue Bottle's expert, Norm Broadhurst, agreed that over 25 other companies use the words

1   "Blue" and "Coffee" in their names.  Id. (citing de Gyarfas Decl. (dkt. 184-4) at 110:20–

2   23, Ex. L (dkt. 184-13) Fig. 8 to Broadhurst Report[9]).

3          Blue Bottle has the stronger argument on commercial strength.  Although "[i]n a

4   crowded field of similar marks, each member of the crowd is relatively weak in its ability

5   to prevent use by others in the crowd," see Miss World (UK) Ltd. v. Mrs. America

6   Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1988) (internal quotation marks omitted)

7   (abrogated on other grounds in Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1355

8   (9th Cir. 1985) (en banc)); see also M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073,

9   1088 (9th Cir. 2005) ("Use of similar marks by third-party companies in the relevant

10  industry weakens the mark at issue."), it is not clear that the other "blue" and "coffee"

11  companies are actually commercial competitors to Blue Bottle, particularly as to the

12  products at issue, see de Gyarfas Decl. Ex. L Fig. 8.  "A crowded field of similar marks is

13  only relevant if there are similar marks on similar goods."  Internet Specialties v. ISPWest,

14  No. CV 05-3296 FMC AJWX, 2006 WL 4568796, at *2 (C.D. Cal. Sept. 19, 2006).

15  Moreover, the third-party registrations "[t]hat a mark is registered does not establish how

16  widely used it is."  JaM Cellars, Inc. v. Vintage Wine Estates, Inc., No. 17-01133-CRB,

17  2017 WL 2535864, at *5 (N.D. Cal. June 12, 2017); see also 2 J. Thomas McCarthy,

18  McCarthy on Trademarks & Unfair Competition § 11:89 (4th ed. 2013) ("The mere

19  citation of third party registrations is not proof of third party uses for the purpose of

20  showing . . . relative weakness.  Third party registrations are not evidence of use 'so as to

21  have conditioned the mind of prospective purchasers.'") (emphasis in original).  Where the

22  record does not reflect the extent of third-party uses, "[t]he probative value of this

23  evidence is [] minimal."  Palm Bay Imports v. Veuve Clicquot, 396 F.3d 1369, 1373–74

24  

25  ----
    [9] Broadhurst listed Blue Bean Coffee, Bluebeard Coffee Roasters, Blue Butterfly Coffee,
26  Blue Door Coffee, Blue Elk Coffee, Blue Sparrow Coffee, Blue Owl Coffee, Blue Donkey
    Coffee, Blue Horse Kona Coffee, Blue Line Coffee Company, Blue Cup Coffee, Blue
27  Moon Coffee, Blue Copper Coffee, Blue Canoe Coffee, Blue Collar Coffee, Blue Hippo
    Coffee, Blue Dot Café and Coffee Bar, Blue Mug Roastery, Blue Ridge Mountain Coffee,
28  Blue Café, Blue Java Café, Blue Flame Coffee, Blue Mountain Coffee, Blue Mountain
    Coffee House, and Blue Ridge Coffee.  Id.  His table states that most of these do not sell
    coffee brewing equipment online.  Id.

(Fed. Cir. 2005).  Blue Bottle's evidence of commercial strength is therefore not meaningfully diminished by Defendants' evidence of third party uses.

Accordingly, because the BLUE BOTTLE Marks are conceptually suggestive, and they are commercially strong, the BLUE BOTTLE Marks are relatively strong.  This factor favors Blue Bottle.

### b.  Similarity of the Marks

"'Similarity of the marks is tested on three levels: sight, sound, and meaning.'" Echo Drain v. Newsted, 307 F. Supp. 2d 1116, 1126 (C.D. Cal. 2003) (quoting Sleekcraft, 599 F.2d at 351).  "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." GoTo.Com, Inc., 202 F.3d at 1206.  Courts are to consider marks in their entireties and as they are encountered in the marketplace. Sleekcraft, 599 F.2d at 351.  While courts "may give greater weight to a dominant feature of a mark (i.e., that which is likely to make a greater impression on an ordinary buyer), in the end the court's analysis must consider and compare the marks in their entirety." SG Servs. Inc. v. God' Girls Inc., No. CV 06-989 AHM (CTx), 2007 WL 2315437, at *4 (C.D. Cal. May 9, 2007).  Additionally, "similarities weigh more heavily than differences," Sleekcraft, 599 F.2d at 351, and "a lesser degree of similarity is required when a trademark holder's mark is strong," Pom Wonderful, 775 F.3d at 1130.

Blue Bottle argues that the marks are "highly similar," relying largely on the USPTO's determination that there is a likelihood of confusion.  See P MSJ at 15.  The USPTO determined in April 2020 that the BLUE BOTTLE Mark was confusingly similar to the BLUE BREW Mark that Liao registered in March 2020.  Id. at 5–6 (citing Young Decl. ¶ 17, Ex. 12, ¶ 18, Ex. 13; FAC Ex. 9 (Blue Brew mark)).

The USPTO's refusal to register a mark because of likelihood of confusion is notable.  See United Artists Corp. v. United Artist Studios LLC, No. CV 19-828-MWF (MAAx), 2019 WL 3293650, at *9 (C.D. Cal. June 3, 2019) ("The Court is particularly persuaded by the fact that the PTO refused to register Defendants' marks because of a likelihood of confusion with Plaintiff's.") (citing Premier Nutrition, Inc. v. Organic Food

United States District Court
Northern District of California

<u>Bar, Inc.</u>, No. 06-SACV-0827 AG (RNBx), 2008 WL 1913163, at *8 (C.D. Cal. Mar. 27, 2008)).  The USPTO's determination is not controlling, however.  <u>See</u> <u>Titaness Light Shop v. Sunlight Supply, Inc.</u>, No. 3:12-cv-0620-LRH-VPC, 2014 WL 358406, at *3 (D. Nev. Jan. 31, 2014) ("determinations by trademark examiners are not binding upon the court . . . there is a different evidentiary standard for determining the likelihood of confusion before the USPTO.").  One court explained:

> Although implicating similar factors, the likelihood-of-confusion analysis that trademark examiners engage in at administrative agencies like the USPTO differs from the analysis that courts engage in during litigation . . . in that the former analysis generally is decided upon 'a comparison of the marks in the abstract,' whereas courts assess the market as it actually exists.

<u>Kohler Co. v. Bold Int'l FZCO</u>, 422 F. Supp. 3d 681, 729 (E.D.N.Y. 2018) (quoting <u>B & B Hardware, Inc. v. Hargis Indus., Inc.</u>, 575 U.S. 138, 135 (2015) (Ginsburg, J., concurring)). This Court must therefore do its own analysis of "sight, sound, and meaning."

As to sound, the BLUE BOTTLE Marks consist of three or four words—"blue," "bottle," and "coffee," and sometimes also "co.," <u>see</u> FAC Ex. 5—while the BLUE BREW Mark consists of two words—"blue" and "brew," <u>see id.</u> Ex. 9.  The word "blue" is of course the same in both, and it is the first word in both, but that is not as significant as Blue Bottle suggests.  <u>See</u> P MSJ at 15.  Even where two marks consisted entirely of the same term, and were used on comparable products, where their "packaging, size, color, shape, and all other attributes" were different, the Ninth Circuit held that there was no likelihood of confusion.  <u>See</u> <u>Arcona, Inc. v. Farmacy Beauty, LLC</u>, 976 F.3d 1074 (9th Cir. 2020) (two eye cream products both called "EYE DEW").  Here, the words that follow "blue" in each mark make the marks sound quite different.  While "bottle coffee"/"bottle coffee co." and "brew" start with the same first letter, the former has four or five syllables and the latter has one.  The words "bottle coffee"/"bottle coffee co." and "brew" do not have the same sounds, and they do not even rhyme.  <u>See, e.g.</u>, <u>Echo Drain</u>, 307 F. Supp. 2d at 1126 ("Because '-brain' and 'Drain' are different words and are phonetically different, the two

1  marks also sound different.").

2      As to meaning, "blue bottle coffee" suggests a blue colored vessel holding coffee,

3  while "blue brew" is more abstract, suggesting some kind of blue concoction either already

4  made or being made.  "Brew" need not refer to coffee—beer and kombucha, for example,

5  are also brewed.  It is therefore not obvious that, as Blue Bottle argues, the "trademarks

6  plainly have the same meaning," and that meaning is coffee.  <u>See</u> P Opp'n at 14.

7      As to sight, the marks are not similar—even taking into account that a "lesser

8  degree of similarity" is required.  <u>See</u> <u>Pom Wonderful</u>, 775 F.3d at 1130.  The marks have

9  the same arguably dominant first word.  <u>See</u> Young Decl. ¶ 18 Ex. 13 (USPTO Nonfinal

10  Office Action) at 3 (finding that "BLUE" is "the more dominant element of the mark").

11  But the marks do not look anything alike when encountered in the marketplace:



| Plaintiff's BLUE BOTTLE Logo Mark - '406 Reg. | | Defendants' BLUE BREW Mark | |
|---|---|---|---|
| | FAC at p. 6 | | ECF No. 32-7 (FAC Ex. 7) |
| | ECF No. 32-2 (FAC Ex. 2) | | ECF No. 32-11 (FAC Ex. 11) |
| | ECF No. 32-2 (FAC Ex. 2) | | ECF No. 32-11 (FAC Ex. 8) |

21  Blue Bottle has a "clean and minimalist aesthetic," P MSJ at 4; <u>see also</u> de Gyarfas Decl.

22  Ex. E (Cha Depo.) at 33:20–34:24 (minimal and modern aesthetic), with a white

23  background and block lettering in the Halis font.  de Gyarfas Decl. Ex. E (Cha Depo.) at

24  150:16–24 (Halis font); de Gyarfas Decl. Ex. D (Cha. Depo) at 52:1653:7 (Halis font).

25  The words "Blue Bottle Coffee" appear, often in black, in close proximity to a solid blue

26  bottle that is centered on the product.  <u>See, e.g.</u>, FAC Ex. 2.  Defendants' marks are much

27  busier.  While the word "brew" is in capital letters, the word "blue" has a large and

28  elaborate letter B, with the top evocative of a mountain range, and the remaining letters in

25

cursive.  See FAC Exs. 7, 8, 11.  The BLUE BREW words are white or silver, and appear on various blue backgrounds.  See id.  Defendants' packaging includes a giant blue cornflower in addition the "BLUE BREW" Mark, and is not minimalist, or modern.  See de Gyarfas Decl. Ex. D at 74:11–16 (answering in the negative to the question, "would you consider that to be—with this splotch and the words all over the place, would you consider that to be a minimal design?"); FAC Ex. 8; de Gyarfas Decl. Ex. E at 82:20–83:12 (big, dark blue cornflower is not minimalist).  The marks are therefore "noticeably different," like the two different marks at issue in Playmakers, LLC v. ESPN, Inc., 297 F. Supp. 2d 1277, 1282–84  (W.D. Wash. 2003) (marks were "PLAY MAKERS" and "PLAYMAKERS," but there was no likelihood of confusion, in large part because plaintiff's mark included stars, had royal blue letters of different sizes with a khaki green A on a white background, and defendant's mark contained "no stars or other designs," and had letters of the same size in white and blue on a dark blue or black background).

Blue Bottle's argument that Defendants' logo "as used on its product packaging . . . looks highly similar to the BLUE BOTTLE Logo Mark" is especially unpersuasive.  See P Opp'n at 14–15 (citing FAC Ex. 8, FAC Ex. 5 at 16).  Defendants' product packaging is a pale blue with a somewhat garish, dark blue cornflower, and the BLUE BREW Mark in white writing, as described above, partially overlapping the flower.  See FAC Ex. 8.  The BLUE BOTTLE Mark that Blue Bottle compares that packaging to—which Blue Bottle does not show on product packaging—uses a similar color font to Defendants' box color, but a very different font (in blue and white), a solid blue bottle, and no flower.  See FAC Ex. 5 at 16.  The BLUE BOTTLE Marks and the BLUE BREW Marks therefore do not make a similar commercial impression in the marketplace.  They look altogether different.  See SG Servs., 2007 WL 2315437, at *4–5 ("when comparing the two sets of marks in their entireties, I find that they are strikingly dissimilar").

Given the differences in sound, meaning, and sight, the Court concludes that— contrary to the USPTO's conclusion—the marks are not similar.  Accordingly, this factor favors Defendants.

### c.     Proximity of the Goods

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." Sleekcraft, 599 F.2d at 350.  "The Ninth Circuit defines 'relatedness' broadly, typically requiring only that the parties participate in the same general industry." Sutter Home Winery v. Madrona Vineyards, L.P., No. C 05-0587 MHP, 2005 WL 701599, at *9 (N.D. Cal. Mar. 23, 2005).  "Both parties sell coffee-related products."  D MSJ at 13. Accordingly, this factor favors Blue Bottle.

### d.     Similarity in the Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." Sleekcraft, 599 F.2d at 353.  "When examining the marketing channels used by the competing companies, [courts] consider where the goods or services are sold, the sales and marketing methods employed, and the class of purchasers exposed to the marketing efforts." La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V., 762 F.3d 867, 876–77 (9th Cir. 2014). When the parties sell through the same retailers, courts find an overlap in marketing channels.  See Adidas Am., Inc. v. Sketchers USA, Inc., 149 F. Supp. 3d 1222, 1242 (D. Or. 2016).

Here, Blue Bottle sells its products through Amazon.com, on its own bluebottle.com website, and in brick-and-mortar stores like Blue Bottle's cafes, grocery stores, and retailers like Target.  P MSJ at 3–4; ███████████████████████ ████████.  Defendants sell their products online only.  de Gyarfas Decl. Ex. F at 104:23– 105:3 ("We sell on Amazon, Walmart, our own website, and also eBay.").  Both parties promote their products through social media sites like Facebook.  See Young Decl. Ex. 4 (dkt. 185-5) (Cha Depo.) at 125:25–126:10 (Blue Bottle focuses on "Google, Facebook, Meta, Twitter"), Ex. 30 (dkt. 185-31) (Blue Bottle on Facebook), Ex. 31 (Blue Bottle on Instagram), Ex. 32 (dkt. 185-33) (Blue Brew on Facebook).

This is not like Detroit Coffee Company, LLC v. Soup For You, LLC, 396 F. Supp. 3d 754, 771–72 (E.D. Mich. 2019), where even though both parties "markete[ed] their

27

goods on the internet," the court found that there was not a significant overlap in marketing channels.  There, the plaintiff sold its goods almost exclusively on their own website, while the defendants sold their goods on "Amazon, retail chains, Eastern Market, and their website."  Id. at 771.  The defendants marketed their goods using a marketing agency and social media, while the plaintiff relied on "word-of-mouth."  Id. at 771–72.  And the plaintiff had "a limited online customer base," making it "unlikely" that "a customer would ever encounter both products.  Id. at 772.  Here, both companies market their products using social media, both seem to primarily sell their products online, and both sell their products on Amazon.  It would not be "unlikely [that] a customer would ever encounter both products."  See id.

Accordingly, the marketing channels are similar, and this factor favors Blue Bottle.

### e.     Type of Goods and Degree of Care

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."  Sleekcraft, 599 F.2d at 353.  "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely."  Id.  "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  Id.  Thus, in E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 465 (N.D. Cal. 1991), where the court found that "the wine-buying public [was] generally unsophisticated 'impulse' buyers who are an 'easy mark for a [trademark] infringer," that lack of sophistication enhanced the likelihood of confusion.

Blue Bottle argues that "[a]lthough pour-over coffee may be slightly more expensive than other forms of coffee, it generally constitutes a low-cost consumer packaged good."  P MSJ at 21 (citing, among other cases, Starbucks Corp. v. Lundberg, No. Civ. 02-948-HA, 2005 WL 3183858, at *12 (D. Or. Nov. 29, 2005) ("The coffee beverages sold by both parties in this action are low cost items."); see also P Opp'n at 16 ("Defendants ignore that coffee—even if high-end or premium—generally constitutes a low-cost consumer good.").  Blue Bottle also argues that consumers who purchase their

products online "tend to exercise less care than" consumers in its Cafes.  P MSJ at 21

(citing <u>Amazon.com v. Pionera Inc.</u>, No. 2:22-cv-01491 DJC AC, 2023 WL 4424649, at

*6 (E.D. Cal. July 10, 2023) ("'Navigating amongst web sites involves practically no effort

whatsoever, and arguments that Web users exercise a great deal of care . . . are

unconvincing.'") (quoting <u>GoTo.com</u>, 202 F.3d at 1209)).

There are a few problems with Blue Bottle's position.  First, the consumer goods at

issue here are not coffee, but coffee-making equipment.  <u>See</u> FAC ¶ 47, Fig. 1.  While

coffee-making equipment is not nearly as expensive as a boat, <u>see</u> <u>Sleekcraft</u>, 599 F.2d at

353 ("this is not the type of purchase made only on 'general impressions'"), the goods here

presumably cost multiple times the cost of a cup of coffee.  Moreover, they are intended

for repeated use, and that use is brewing coffee at home to try to replicate Blue Bottle's

"premium 'pour-over' coffee."  <u>See</u> FAC ¶ 15.  A second problem is that Blue Bottle has

spent a fair amount of time asserting that its customers are sophisticated and careful.  Blue

Bottle wrote to the USPTO:

> Applicant is known to be a major player in "third wave
> coffee," a movement led by both consumers and manufacturers
> to appreciate high-quality coffee. See
> https://en.wikipedia.org/wiki/Third wave of coffee As a result,
> <u>Applicant's consumers are highly sophisticated third wave</u>
> <u>coffee consumers who exercise care in purchasing their coffee</u>
> <u>products and related goods.</u> Furthermore, Applicant's
> consumers are exposed to Applicant's goods within the context
> of Applicant's cafes or on Applicant's website <
> https://bluebottlecoffee.com>. This further minimizes any
> perceived likelihood of confusion. See§ 1207.0l(d)(vii).).

RJN Ex. 171 (Blue Botte Response to Office Action  re preliminary refusal) at 6–7

(emphasis added).  ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████  But that just means that some of Blue Bottle's

customers will exercise a higher degree of care than others.  Finally, the Ninth Circuit has

recognized that it is no longer accurate to conclude "that Internet users on the whole

exercise a low degree of care."  See Network Automation, Inc., 638 F.3d at 1153.

Even though the goods at issue here are not terribly expensive, there is reason to believe that the buyer will exercise some care about his purchases.  Accordingly, this factor only minimally favors Blue Bottle, or is neutral.

### f.      Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely," but "[p]roving actual confusion is difficult[.]"  Sleekcraft, 599 F.2d at 352.  "Because of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive."  Id. at 353.  "Consequently, this factor is weighed heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available."  Id.; see also New West Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1201 (9th Cir. 1979) ("Neither actual confusion nor intent are necessary to a finding of [l]ikelihood of confusion.").  Two categories of evidence are relevant to this factor: (i) evidence of actual confusion and (ii) survey evidence.

### i.      Evidence of Actual Confusion

Here, there is no evidence of actual customer confusion.  See de Gyarfas Decl. Ex. V at 15 (stating in Second Supplemental Response to interrogatories: "as of the date of these supplemental interrogatory responses, Blue Bottle has not been made aware of any actual customer confusion."); de Gyarfas Decl. Ex. E at 123:16–19 (Cha answering "No, I do not" to question of whether there is "any evidence of any specific consumers expressing confusion?"), 169:9–14 (answering "I'm not specifically aware" to question of whether "any consumer [was] actually . . . confused into thinking that Blue Brew was associated with Blue Bottle Coffee?").

Defendants launched Blue Brew in 2017, so one might expect some

confusion to have arisen by now.  See de Gyarfas Decl. Ex. F at 26:12–27:21; see also Brookfield Commc'ns, Inc., 174 F.3d at 1050 ("We cannot think of more persuasive evidence that there is no likelihood of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what.").

### ii.    Survey Evidence

Survey evidence is another means of demonstrating actual confusion.  See BBK Tobacco & Foods LLP v. Cent. Coast Agric. Inc., 615 F. Supp. 3d 982, 1020 (D. Ariz. 2022), aff'd in part, rev'd in part and remanded, No. 22-16190, 2024 WL 1364300 (9th Cir. Apr. 1, 2024), and aff'd, No. 22-16190, 2024 WL 1356981 (9th Cir. Apr. 1, 2024) ("Two sorts of evidence are probative of actual confusion: evidence of actual instances of confusion and survey evidence.").  "[S]urvey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'"  Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997)).  In addition, "'technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'"  Id. (quoting Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988)).[10]

Defendants point to the survey results of their expert, Rhonda Harper, which they assert shows that there is virtually no likelihood of confusion.  D MSJ at 17.  Harper's "Trademark Forward Consumer Confusion Survey" sought "to determine whether, and if so to what degree, relevant consumers confuse the source of the Defendant's BLUE BREW trademark  as being made by, associated or affiliated with, or approved or

---

[10] In Jack Daniel's Properties, Inc. v. VIP Prods. LLC, Justice Sotomayor recently stated that "Courts should . . . ensure surveys do not completely displace other likelihood-of-confusion factors, which may more accurately track the . . . experiences of actual consumers in the marketplace.  Courts should also be attentive to ways in which surveys may . . . artificially prompt such confusion about the law or fail to sufficiently control for it."  599 U.S. 140, 164–65 (2023) (Sotomayor, J., concurring).  In that case, the district court had "found, based largely on survey evidence, that consumers were likely to be confused."  Id. at 151–52. !

1    authorized by, the Plaintiff's BLUE BOTTLE." Young Decl. Ex. 40 (dkt. 185-41); de

2    Gyarfas Decl. Ex. I (dkt. 184-10) ¶ 28.  In Harper's study, only 0.7% of survey

3    respondents thought that Blue Bottle manufactured Blue Brew products.  See id. ¶ 79.

4    "When the percentage results of a confusion survey dip below 10%, they can become

5    evidence which will indicate that confusion is not likely."  5 McCarthy § 32:189.

6           Blue Bottle argues that the Harper Surveys[11] "are fatally flawed to the point that

7    they should be excluded entirely," and, if admitted, "cannot demonstrate a genuine dispute

8    that no likelihood of confusion exists."  P MSJ at 22.[12]  Blue Bottle purports to identify

9    five problems with the surveys: (1) the surveys used an "improper universe of

10   respondents," because Harper did not confirm that respondents actually shopped for coffee

11   at the identified retailers, and did not include screening questions about price points; (2)

12   the Eveready survey format that Harper used was inappropriate because the parties'

13   products were competitively proximate; (3) the screening questions indicated that the

14   survey was about coffee products, which revealed the "right answer"; (4) the survey

15   questions improperly asked who manufactured a given product, and not who "makes or

16   puts out" the product; and (5) the survey "failed to replicate marketplace conditions"

17   because it "did not include the full webpage or product description."  Id. at 22–24.

18          These criticisms do not warrant the exclusion of the Harper survey.

19          First, the survey properly screened for actual and potential purchasers of coffee

20   products who shop at the relevant retailers.  See Young Decl. Ex. 40 at 39 (retailers,

21   coffee-making products).  Blue Bottle identifies no authority for the proposition that

22   Harper should have "confirm[ed] that respondents actually" did so.  See P MSJ at 23.[13]

---

[11] Harper also produced other surveys.  See Young Decl. Exs. 41 (dkt. 185-42), 42 (dkt. 185-43).

[12] Blue Bottle also promises a forthcoming Daubert motion on Harper, but it does not appear that it ever filed one.  See id.  Blue Bottle earlier sought to exclude the Harper Secondary Meaning Survey, and the Court denied that motion.  See Order Denying Motion to Exclude (dkt. 178) at 1 (holding that "the survey was conducted according to accepted principles, and any further criticism of the survey goes to its weight rather than its admissibility.").

[13] In addition, while "'serious flaws in a survey will make any reliance on that survey unreasonable,'" Icon Enterprises Int'l, Inc. v. Am. Prod. Co., No. CV 04-1240 SVW

United States District Court
Northern District of California

Second, the Eveready format is appropriate where the senior user is "'top of mind'—readily recognized by consumers in the relevant universe." BBK Tobacco, 615 F. Supp. 3d at 1001. BBK Tobacco, the case that Blue Bottle cited on this point, see P MSJ at 23, called the Eveready format "the gold standard for assessing confusion as to (readily recalled) top-of-mind marks." 615 F. Supp. 3d at 1001. Blue Bottle identifies itself as "a recognizable brand name among consumers." FAC ¶ 16. Additionally, Blue Bottle's authority about a different methodology, the Squirt survey, only states that that methodology is "appropriate," not that it is superior. See P MSJ at 23. "[T]he Squirt format is appropriate principally where a case involves 'marks that are weak, but are simultaneously or sequentially accessible in the marketplace for comparison.'" BBK Tobacco, 615 F. Supp. 3d at 1001 (quoting Jerre B. Swann, Likelihood of Confusion Studies and the Straightened Scope of Squirt, 98 Trademark Rep. 739, 755–56 (2008)). Blue Bottle does not contend that its mark is weak. See P MSJ at 18–19 (arguing that its marks are strong). As to competitive proximity, Defendants demonstrated that "[i]nternet searches for 'pour over coffee maker' reveal that the Blue Brew product appears, but Plaintiff's product does not." D Opp'n at 19 (citing de Gyarfas Decl. Ex. FF (dkt. 191-8), GG (dkt. 191-9), HH (dkt. 191-10)). The products are therefore not competitively proximate. See de Gyarfas Decl. Ex. EE (dkt. 191-7) at 75.

Third, Blue Bottle fails to explain how the screening questions revealed the right answer to the survey. Even if the questions signaled a focus on coffee, see P MSJ at 23–24, they did not signal the right answers about confusion.

Fourth, Blue Bottle's concern about the survey's use of "manufactures" instead of "makes or puts out" is unfounded. While "manufactures" may be the standard wording,

PLAx, 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7, 2004) (quoting Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477, 488 (5th Cir. 2004)), "courts within the Ninth Circuit are reluctant to exclude survey evidence on the basis of an overinclusive or underinclusive target population," id.; see also Simpson Strong-Tie Co. Inc. v. MiTek Inc., No. 20-cv-06957-VKD, 2023 WL 137478, at *3 (N.D. Cal. Jan. 9, 2023) ("Even if a survey does not select the optimal universe, the results are often still probative of the proposition the survey was intended to test.").

33

where the goods are sold at third-party retailers like Amazon, respondents might have answered that Amazon "puts out" the goods, which would have been useless.

Fifth, the surveys did replicate the market conditions: they included the relevant portions of Amazon pages, including a photo of the product (with additional photos below), the title of the product, a link to the Blue Brew store, customer reviews, a price, information about shipping, as well as the material. See Young Decl. Ex. 40 at 20–21.

Because the survey appears appropriate, and showed no likelihood of confusion, and because Blue Bottle has identified no evidence of actual confusion despite Blue Brew's emergence several years ago, this factor favors Defendants.

### g.    Defendants' Intent

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Sleekcraft, 599 F.2d at 354.  Although "an intent to confuse consumers is not required for a finding of trademark infringement," Brookfield Commc'ns, Inc., 174 F.3d at 1059, where it exists, it is "strong evidence of a likelihood of confusion," Entrepreneur Media, Inc., 279 F.3d at 1148.

Blue Bottle contends that Defendants intended to adopt Blue Bottle's marks. See P MSJ at 20–21.  There are three main grounds for this contention. Id.

Blue Bottle argues that Liao's home was about 3.5 miles from a Blue Bottle café location in Oakland.  See id. at 20 (citing Young Decl. Exs. 1, 6 at 14:22–15:17, 30:6–31:4. Ex. 34).  This is irrelevant.  Liao testified that she had not seen this café—that she did not go to downtown Oakland often because of safety concerns, and that if she did, it was only to go to Chinatown for dinner.  Young Decl. Ex. 6 at 31:5–22.  She testified that she was not very familiar with the street the Blue Bottle café was on and had not driven it end to end.  Id. at 31:23–33:3.  She also submitted a declaration stating: "I have never visited and I have not seen a Blue Bottle Café.  Specifically, I was not aware that there was a Blue Bottle café location in Oakland, California at the time the Blue Brew trademark application was filed, and I have never been to a Blue Bottle café."  de Gyarfas Decl. Ex. II

34

(Liao Decl.) (dkt. 191-11) ¶ 2.  But even if Liao had seen a Blue Bottle café, or been inside one, it would not mean that she intended to confuse Blue Bottle's customers.

Blue Bottle also argues that Blue Bottle's federal trademark registrations created a legal presumption that put Defendants on notice of Blue Bottle's ownership rights.  P MSJ at 20–21 (citing, among other cases, <u>Color Me House v. Discovery Commc'ns</u>, No. C12–5935 RJB, 2013 WL 1283806, at *8 (W.D. Wash. Mar. 27, 2013)).  But constructive or even actual knowledge that Blue Bottle owned the BLUE BOTTLE Marks does not demonstrate that Defendants intended to confuse customers by naming their brand BLUE BREW.  Moreover, Liao testified that she ran a Google search for "Blue Brew" before deciding to use the name; she did not see "any other Blue Brews" and she did not see "Blue Bottle Coffee."  de Gyarfas Decl. Ex. F at 57:15–58:2, 59:14–17.  She also testified that when she applied for a Blue Brew trademark in 2017, she was not aware that Blue Bottle had trademark registrations.  <u>Id.</u> at 95:8–14.

Blue Bottle further argues that Defendants were "well aware of the Blue Bottle brand when they designed and began using the BLUE BREW Mark," because Liao admitted being aware of Blue Bottle as of 2017.  P MSJ at 20 (citing Young Decl. Ex. 6 at 91:4–92:24) (Liao visited Blue Bottle website after seeing a post on Facebook).  Blue Bottle also asserts that Defendants repeatedly referenced Blue Bottle when they created the Blue Brew brand in 2017, and that Liao admitted having seen a Blue Bottle ad on June 13, 2017, on the same day she was selecting a color for the Blue Brew brand with her designer.  <u>Id.</u> (citing Young Decl. Ex. 6 at 91:4–92:24; ██████████████████████ ██████████████████)[14]; Young Decl. Ex. 9 at 34:15–22 (saw ad on Facebook June 13, 2017); ████████████████████████████████████

These facts also do not demonstrate an intent to copy Blue Bottle marks.  The June 13, 2017 Blue Bottle ad could not have been what inspired BLUE BREW, because Liao was already working on the BLUE BREW Mark, and referencing the mountain inspiration,

---

[14] This exhibit is the same as de Gyarfas Decl. Ex. 3, which was not filed under seal.

in May of 2017.  A May 26, 2017 email from Liao stated: "The name 'Blue Brew' is inspired by the Blue Mountain in Jamaica, where coffee of the best quality was planted 3000–5500 feet above sea level. . . . The element in the logo can be something related to Blue Mountain, coffee/coffee tree, or anything that remind the enjoyment of coffee or life in general."  See de Gyarfas Decl. Ex. 3 at 3.  The June 13, 2017 email from Liao to the designer in that same email string appears to be the first reference to the blue color; Liao stated: "I like the light blue more than dark blue, maybe more modern color.  Reference Blue bottle coffee."  Id. at 1.  "Reference Blue bottle coffee" is ambiguous as to whether Liao wanted to use something like Blue Bottle's color mark—and her testimony on the issue was unclear.  Compare Young Decl. Ex. 9 at 31:13–20 ("[t]hat day I happened to see the Blue Bottle. . . . I had my mind set on light blue so I told her  . . . to look at Blue Bottle as a reference for what I wanted, which is the light blue.") with id. at 32:10–12 ("what I meant by the reference was instructing her to not use that blue anymore."), 33:1–2 ("what I meant by the reference is to tell her not to use that blue.").  But even if the June 13, 2017 email had meant "use something like the Blue Bottle blue mark," Liao's July 3, 2017 email to the designer stated unambiguously that Liao did not want to use Blue Bottle's color: "We finally settled on one design.  Can you please change the e a little bit?  Also, can you make the color of ocean blue and some other blues except bottle blue's blue?"  See de Gyarfas Decl. Ex. 4.  Accordingly, Liao's emails with the designer of the BLUE BREW Mark do not reflect an intent to copy Blue Bottle's marks.

In addition, Blue Bottle witnesses admitted that they were not aware of any evidence of intentional copying.  ███████████████████████████████ ████████████████  de Gyarfas Decl. Ex. D at 111:17–21 (Cha does not know of any evidence); Gyrarfas Decl. Ex. E at 125:2–20 (Cha does not know of any proof of bad intention; could only speculate).

Because there is no evidence of an intent to copy, this factor favors Defendants.

### h.    Likelihood of Expansion

"Inasmuch as a trademark owner is afforded greater protection against competing

36

United States District Court
Northern District of California

goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 599 F.2d at 354.  There is no evidence that either party will expand its business, and the parties' goods already overlap.  This factor is therefore not significant.

### i.    Conclusion as to Sleekcraft factors

"To prevail on the ultimate question toward which the Sleekcraft analysis is directed—the likelihood of confusion of consumers—[the plaintiff] must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible.'" M2 Software, Inc., 421 F.3d at 1085 (quoting Murray v. CNBC, 86 F.3d 858, 861 (9th Cir. 1996)).  The Sleekcraft factors are "not a rote checklist."  Rearden LLC, 683 F.3d at 1209.  "In other words, 'we do not count beans.'"  Id. (quoting Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 2998).  The Court's "determination may rest on only those factors that are most pertinent to the particular case before the court."  Id.

The Sleekcraft factors here are mixed.  While Blue Bottle's mark is relatively strong, and the goods and marketing channels are similar, the marks are not similar, and there is no evidence of actual confusion or an intent to confuse.  The lack of similarity of the marks is especially significant.  Similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis."  See GoTo.com, 202 F.3d at 1205 (citing Brookfield Commc'ns, Inc., 174 F.3d at 1054).  No matter how similar the goods and marketing channels, if the marks are not very similar, there is little risk of confusion.  See Brookfield Commc'ns, Inc., 174 F.3d at 1054 ("Where the two marks are entirely dissimilar, there is no likelihood of confusion."); Playmakers, 297 F. Supp. 2d at 1282 ("The most important factor in any likelihood of confusion analysis is the similarity of the marks.  Without similarity, there can be no confusion.").

Based on the Sleekcraft factors, and primarily on the lack of similarity in sight, sound, and meaning between the marks, the Court concludes that Blue Bottle has failed to demonstrate that "confusion is 'probable,' not merely 'possible.'"  See M2 Software, Inc.,

1    421 F.3d at 1085.  Notwithstanding the USPTO's conclusion, there is no likelihood of

2    confusion as to the BLUE BOTTLE Marks and the BLUE BREW Marks.  See Moab

3    Indus., LLC v. FCA US, LLC, No. 3:12-cv-8247-HRH, 2016 WL 5859700, at *7 (D. Ariz.

4    Oct. 6, 2016) ("The USPTO finding of potential confusion is entitled to very little weight

5    inasmuch as the USPTO would not have had access to most of the evidence which is

6    before the court.").

7         **C.**    **BLUE BOTTLE BLUE Mark and BLUE BREW Mark**

8         This order next addresses Blue Bottle's claims that the BLUE BREW Mark

9    infringes on Blue Bottle's BLUE BOTTLE BLUE Marks.[15]  Defendants argue that there is

10   no infringement of the BLUE BOTTLE BLUE Marks because (1) those marks have no

11   secondary meaning and (2) there is no likelihood of confusion.  D MSJ at 19–22.

12         **1.**    **Secondary Meaning**

13        Defendant's first argument is that the BLUE BOTTLE BLUE Marks have no

14   secondary meaning.  Id. at 19–20.  Color marks are not inherently distinctive; they may

15   only become distinctive and protectible (i.e. valid as trademarks) if they have acquired

16   secondary meaning.  See Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205,

17   211–12 (2000) (no color mark "can ever be inherently distinctive") (citing Qualitex Co. v.

18   Jacobson Prods. Co., Inc., 514 U.S. 159, 162–63 (1995)).  Secondary meaning means that

19   "over time, customers may come to treat a particular color on a product or its packaging . .

20   . as signifying a brand.  And, if so, that color would have come to identify and distinguish

21   the goods . . . much in the way that descriptive words on a product . . . can come to

22   indicate a product's origin."  Qualitex, 514 U.S. at 163.  This order discusses secondary

23   meaning via (a) registration, (b) survey evidence, and (c) a five-factor test.

24         **a.**    **Registration**

25        Blue Bottle is the exclusive licensee to (but as discussed earlier, not the owner of)

26   the BLUE BOTTLE BLUE Marks.  P MSJ at 8 n.8 (citing Young Decl. ¶ 48, Ex. 43 at

27

28   ───────────────────
     [15] This issue determines claims 3, 4, 11, and 15.

United States District Court
Northern District of California

United States District Court
Northern District of California

10:21–11:19.  Those Marks enjoy a presumption of secondary meaning as of the date of their registration.  See Americana Trading Inc., 966 F.2d at 1287.  Blue Bottle secured registrations for the BLUE BOTTLE BLUE Marks as of December 22, 2020.  See FAC Ex. 6.[16]  The registrations are prima facie evidence of the validity of the trademarks as of December 22, 2020.  But 2020 was after Defendants began using the BLUE BREW Mark. See de Gyarfas Decl. Ex. CC (dkt. 191-5) (Liao Depo. Ex. 32 showing Blue Brew sales from 2018 on).  Because Defendants' Blue Brew sales pre-date Blue Bottle's registration of the BLUE BOTTLE BLUE Marks, Blue Bottle "must establish without the benefit of the presumption that its mark had acquired secondary meaning before the first infringing use by [Defendants]."  See Converse, Inc. v. ITC Sketchers USA, Inc., 909 F.3d 1110, 1118 (Fed. Cir. 2018).

### b.  Survey

   "An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."  Vision Sports, Inc. v. Melville Corp., 888 F. 2d 609, 615 (9th Cir. 1989).  Blue Bottle does not have a survey demonstrating secondary meaning.  Defendants, however, have a survey demonstrating its absence.  Defendants' expert, Harper, conducted a Secondary Meaning Survey, in which only 0.3% of respondents identified BLUE BOTTLE BLUE (Pantone 2995 C) with Blue Bottle, and none of those respondents associated the color with Blue Bottle alone.  See de Gyarfas Decl. Ex. H (dkt. 184-9) ¶¶ 84–85.  This meant that BLUE BOTTLE BLUE had "a net 0% secondary meaning."  Id. ¶ 81.  Accordingly, Harper concluded that the BLUE BOTTLE BLUE Marks have not acquired a level of secondary meaning in the minds of the relevant customers.  Id. ¶ 85. Blue Bottle moved earlier in the case to exclude this opinion, and the Court denied that motion.  See Order Denying Motion to Exclude at 1 ("Because the survey was conducted according to accepted principles, and any further criticism of the survey goes to its weight rather than its admissibility, the Court DENIES the motion.").  Blue Bottle tries to revive

---

[16] Blue Bottle states that there are three registrations, see P MSJ at 9, but the exhibit it cites to only includes two, see FAC Ex. 6.  The complaint also references two.  See FAC ¶ 37.

39

1   some of its criticisms here, see P Opp'n at 11 (citing Motion to Exclude (dkt. 150)).  For

2   the reasons stated in the Court's Order Denying Motion to Exclude, those criticisms are

3   unpersuasive.

### c.    Test

5   Another way of establishing secondary meaning is through a five-factor test, which

6   considers: "(1) whether actual purchasers of the products or services bearing the claimed

7   trademark associate the trademark with the producer; (2) the degree and manner of

8   advertising under the claimed trademark; (3) the length and manner of use of the claimed

9   trademark; (4) whether use of the claimed trademark has been exclusive; and (5) proof of

10  intentional copying."  West Coast Corvettes v. MV Mktg., No. SACV 12-0269

11  DOC(RNBx), 2012 WL 12882014, at *7 (C.D. Cal. Dec. 13, 2012).  As applied to the

12  BLUE BOTTLE BLUE Marks, this test is mixed.

13  First, Blue Bottle asserts that its marks "are widely recognized by consumers"

14  because (a) customer interview videos show that they associate the marks with Blue Bottle,

15  (b) Blue Bottle has received extensive news and social media coverage, and (c) Blue

16  Bottle's collaborations and co-branding arrangements have enabled it "to leverage the

17  selling power of its trademarks."  See P MSJ at 9–11. ███████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████.  That hand-selected Blue Bottle

23  customers associate its Marks with the brand does not say anything about what the

24  purchasing public thinks.  On the other hand, the media coverage Blue Bottle points to

25  does demonstrate a widespread recognition of its brand.  See, e.g., Cha Decl. ¶¶ 25–26.

26  Some of these articles refer to Blue Bottle's brand and design aesthetic.  See id. Exs. 8 at 4

27  and 9 at 7.  While Defendants respond that the articles do not sufficiently reference the

28  BLUE BOTTLE BLUE COLOR, see D Opp'n at 8–9, Defendants do not cite to authority

1    requiring so narrow a focus.  Blue Bottle's collaborations and co-branding arrangements

2    prominently feature the BLUE BOTTLE BLUE Marks, see ███████████████████

3    ███████████, and therefore also support Blue Bottle's argument for secondary

4    meaning.  See Gianni Versace, S.P.A. v. Versace 19.69 Abbigliamento Sportivo SRL, 328

5    F.Supp.3d 1007, 1016–17 (N.D. Cal. 2018) (evidence that licensees entered into

6    agreements because of the value of Versace name support secondary meaning).

7         Second, Blue Bottle asserts that it has spent "millions" of dollars on advertising and

8    marketing—through e-commerce, in its brick-and-mortar stores, and via co-branding

9    agreements.  P MSJ at 11–12; Cha Decl. ¶¶ 20–23.  Nearly every Blue Bottle ad contains

10   the BLUE BOTTLE Marks and the BLUE BOTTLE BLUE Marks.  Id. ¶ 18; see also id. ¶

11   19 ("From 2008–2023, Blue Bottle's marketing and advertising budget has grown

12   exponentially along with the revenues generated from the sales of Blue Bottle's goods and

13   services.").  Defendants respond that ██████████ in unidentified expenditures over 20

14   years . . . is virtually nothing compared to the expenditures of well-known marks such as

15   T-Mobile or Coca Cola."  D Opp'n at 9.  But Blue Bottle need not have spent Coca Cola

16   money for its advertising sales to support a finding of secondary meaning.  See Tranik

17   Enters. v. Fulda, No. 2:16-cv-029310SVW-JC, 2017 WL 11150925, at *4 (C.D. Cal.

18   March 7, 2017) ("spent millions of dollars in advertising in order to increase . . .

19   awareness" over sixteen years); Gucci Timepieces Am. Inc. v. Yidah Watch Co., No. CV-

20   97-6985-KMW (MANx), 1998 WL 650078, at *4 (C.D. Cal. Aug. 4, 1998) (spending

21   "over $1.4 million on advertising" and selling 27,000 units "sufficient to find secondary

22   meaning).  While Defendants are correct that "the mere expenditure of money is not, in

23   itself, determinative of secondary meaning," see D Opp'n at 9 (quoting Order Denying

24   Motion to Exclude at 27), Blue Bottle's advertising, which nearly always contains its

25   Marks, see Cha Decl. ¶ 18, is "of a 'nature and extent to create an association' with the

26   advertiser's goods," see Nguyen v. Smartervitamins Corp., No. 8:21-CV-00832-DOC-

27   ADS, 2023 WL 6879339, at *9 (C.D. Cal. Oct. 16, 2023) (quoting Art Attacks Ink, LLC v.

28   MGA Entmnt. Inc., 581 F.3d 1138, 1146 (9th Cir. 2009)).  Defendants complain that Blue

United States District Court
Northern District of California

Bottle has provided insufficient evidence of the effectiveness of its advertising, see D

Opp'n at 10, but Blue Bottle's sales—"more than ███████████████████████████

████████████████████ in 2022," P MSJ at 12—suggest that the marks have acquired

secondary meaning.  See Gianni Versace, 328 F. Supp. 3d at 1016–17 ("annual revenues of

over $100 million" support secondary meaning).

Third, Blue Bottle asserts that, from its inception in 2002, Blue Bottle has

continuously used its company name, "Blue Bottle Coffee," and combined the "BLUE

BOTTLE" word mark with "BLUE BOTTLE BLUE."  P MSJ at 12; Cha Decl. ¶¶ 8, 9;

Young Decl. Ex. 4 at 90:12–92:10 ("we've used that color really since 2002, since the

beginning, or at least an expression of very close to it"), 95:17–96:19 ("consistent use of

that color over time").  This continuous use supports secondary meaning.

Fourth, Blue Bottle asserts that its use of BLUE BOTTLE BLUE has been

"substantially exclusive in the premium coffee category."  P MSJ at 12–13.  Blue Bottle

points to evidence that its competitors in the "third wave"—████████████████████

███████████████████████████████████████—primarily use non-blue

color in their logos.  See id. ████████████████████████████  Defendants'

response to this point is rather weak: that "the blue color used on the Maxwell House

Coffee can is similar to the Pantone 2995 C color Plaintiff uses," D Opp'n at 10 ████████

████████████████████████, and that Blue Bottle admits that it has seen blue

packaging on other coffee products, id. (citing Cha Depo. at 38:4–9).  But some coffee

products being packaged in blue does not undermine the notion that Blue Bottle has made

exclusive use of the BLUE BOTTLE BLUE color.  Indeed, Blue Bottle's expert, Norman

Broadhurst, stated that, having reviewed two hundred coffee packages from 67 coffee

brands, "none of the product packages [] (including those that use the color blue or feature

blue elements) resemble Blue Bottle's product packaging closely enough to detract from

the distinctiveness of Blue Bottle's packaging."  Slavin Decl. Ex. 5 (dkt. 160-6) ¶¶ 44–45.

[17] ████████████████████████████████████████████████████████████

As to the Maxwell House can, no one contends that Maxwell House is a competitor in the "third wave" of coffee, ████████████████████████████████████████████ ████████████████████████████████ and therefore a competitor of Blue Bottle's. It is not even clear that Maxwell House sells coffee-making equipment. The applicable standard is "substantial exclusivity," see West Coast Corvettes, 2012 WL 12882014, at *8 (plaintiff showed "substantial exclusivity sufficient to establish a secondary meaning" despite presence of three other alleged users of the mark), and Blue Bottle has met it.

Fifth, Blue Bottle asserts that Defendants intentionally copied its Marks. P MSJ at 13–14. As discussed above, the evidence does not support this assertion.

Four of the five factors therefore favor secondary meaning.

### d. Conclusion as to Secondary Meaning

Weighing against secondary meaning, the Harper survey concludes that the BLUE BOTTLE BLUE Marks have zero secondary meaning, and there is a lack of evidence of intentional copying. Weighing in favor of secondary meaning, there is evidence, primarily in the form of media coverage, that actual purchasers associate the trademark with Blue Bottle, there is significant advertising by Blue Bottle, Blue Bottle has used the Marks for over twenty years, and its use has been substantially exclusive. On the whole, the Court concludes that Blue Bottle has met its burden on secondary meaning for the BLUE BOTTLE BLUE Marks. Blue Bottle must next establish a likelihood of confusion.

### 2. Likelihood of Confusion

Defendant's second argument is that there is no likelihood of confusion between Defendants' shade of blue and the BLUE BOTTLE BLUE Marks, "for all of the same reasons" that there is no likelihood of confusion between the BLUE BREW Mark and the BLUE BOTTLE Marks. D MSJ at 20–22. Again, the controlling authority on this issue is Sleekcraft, 599 F.2d at 348–49. Much of the analysis is indeed the same as above.

As to the strength of the BLUE BOTTLE BLUE Marks, the color blue has no intrinsic connection to coffee, and so is arbitrary, see Brookfield Commc'ns, Inc., 174 F.3d at 1058 n.19 ("[a]rbitrary and fanciful marks have no intrinsic connection to the product

United States District Court
Northern District of California

with which the mark is used"), and "for the same reasons that [the BLUE BOTTLE BLUE Marks] enjoy secondary meaning," they are also commercially strong, see Cal. Sec. Alarms v. Escobar's Sec. Plus Alarm Sys., Inc., No. C-95-3749 MMC, 1996 WL 580841, at *5 (N.D. Cal. Sept. 30, 1996) ("[a]cquired strength is another name for secondary meaning").  The Marks are strong.

As to similarity, "[a] determination that two marks are similar in 'appearance' essentially amounts to an 'I know it when I see it' analysis."  Vertos Med., Inc. v. Globus Med., Inc., No. 09-1411 PJH, 2009 WL 3740709, at *6 (N.D. Cal. Nov. 6, 2009).  The colors at issue here are:



D MSJ at 21.  Blue Bottle characterizes Blue Brew's light blue color as "an identical or nearly identical shade of blue."  P MSJ at 16.  The Court disagrees.  The colors have different Pantone numbers, and look different to the eye: the BLUE BOTTLE BLUE is darker and brighter, like an ocean blue, the BLUE BREW color is lighter and paler, like a powder blue.  Moreover, the BLUE BREW color is paired with the darker, more purple blue used for the cornflower on its packaging.  See FAC Ex. 8.  The colors are far more distinct than the maroon colors at issue in Pom Wonderful, 775 F.3d at 1128 (both marks were in "white [font] that is offset by a dark maroon background.").  The Court does not find them similar, even though "a lesser degree of similarity is required when a trademark holder's mark is strong," id., 775 F.3d at 1130.

As to proximity of the goods and similarity in marketing channels, as stated above, "[b]oth parties sell coffee-related products," D MSJ at 13, and both parties use social media, both seem to primarily sell their products online, and both sell their products on

Amazon, P MSJ at 3–4; ██████████████████████ de Gyarfas Decl. Ex. F at 104:23–105:3; Young Decl. Ex. 4 at 125:25–126:10; id. Ex. 32 (dkt. 185-33).  As to the type of goods and degree of care, as stated above, although the goods are not terribly expensive, there is reason to believe that the buyer will exercise some care.  See RJN Ex. 171 at 6–7 ("Applicant's consumers are highly sophisticated third wave coffee consumers who exercise care in purchasing their coffee products and related goods.").  As to intent, as stated above, Blue Bottle witnesses admitted that they were not aware of any evidence of intentional copying, see ███████████████████ de Gyarfas Decl. Ex. D at 111:17–21; Gyrarfas Decl. Ex. E at 125:2–20, and there is evidence that Liao instructed her designer not to use "blue bottle's blue," see de Gyarfas Decl. Ex. 4.  As to likelihood of expansion, as stated above, there is no evidence that either party will expand its business, and the parties' goods already overlap.

As to actual confusion, as stated above, there is no evidence of actual customer confusion.  See, e.g., de Gyarfas Decl. Ex. V at 15.  Moreover, Defendants' expert, Harper, conducted a study on this subject.  See id. Ex. J (dkt. 184-11).  That "MBA Color Likelihood of Confusion" survey sought to "determine whether, and if so to what degree, relevant consumers confuse the source of [Defendants'] BLUE color usage as being made by, associated or affiliated with, or approved or authorized by Plaintiff's BLUE BOTTLE."  Id. ¶ 28.  Harper found that of the 300 respondents to the survey, two answered that Blue Bottle manufactures BLUE BREW, none answered that BLUE BREW is associated/affiliated with Blue Bottle, and one answered that BLUE BREW received authorization or approval from Blue Bottle.  Id. ¶ 66.  This meant that "a net total of 1% of respondents answered that . . . BLUE BREW is made by, is associated/affiliated with, or received authorization or approval from" Blue Bottle.  Id. ¶ 68.  Harper therefore concluded that Defendants' use of blue did not create a likelihood of confusion with respect to BLUE BOTTLE BLUE.  Id. ¶ 70.  A percentage that small supports the conclusion that there is no likelihood of confusion.  See Newport Pac. Corp. v. Moe's Southwest Grill, LLC, No. 05-995-KI, 2006 WL 2811905, at *14 (D. Or. Sept. 28, 2006)

("Confusion survey results below 10% are evidence that confusion is not likely.") (citing 5 McCarthy § 32:189). Blue Bottle's challenges to Harper's reports, as stated above, are unpersuasive.

While the <u>Sleekcraft</u> factors are again mixed, the Court is persuaded that the lack of similarity, the lack of intent, and the lack of actual confusion mean that there is not sufficient evidence to permit a rational trier of fact to find that confusion is "'probable,' not merely 'possible.'" See <u>M2 Software, Inc.</u>, 421 F.3d at 1085. The Court therefore holds that there is no likelihood of confusion as to the BLUE BOTTLE BLUE Marks and the BLUE BREW Marks.

**D.      Trade Dress**

Finally, this order addresses Blue Bottle's claim that Defendants' trade dress infringes on Blue Bottle's trade dress.[18] Blue Bottle does not move for summary judgment on this claim, but Defendant does. See generally P MSJ; D MSJ. "'Trade dress' refers to the 'total image of a product' and may include features such as size, shape, color, color combinations, texture or graphics." <u>Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.</u>, 4 F.3d 819, 822 (9th Cir. 1993). "To recover for the infringement of . . . trade dress under section 43(a) of the Lanham Act, [the plaintiff] ha[s] to prove that (1) the . . . design is nonfunctional, (2) the design is inherently distinctive or acquired distinctiveness through a secondary meaning, and (3) there is a likelihood that the consuming public will confuse [the defendant's design] with [the plaintiff's design]." <u>Disc Golf Ass'n, Inc. v. Champion Discs, Inc.</u>, 158 F.3d 1002, 1005 (9th Cir. 1998). Defendants challenge each of these factors, and argue that Blue Bottle has not adequately identified its trade dress. D MSJ at 22–25.

**1.      Adequately Identified**

In its complaint, Blue Bottle lists the following as its trade dress:

(i)      use of the word "Blue" (<u>i.e.</u>, "Blue Bottle");

---

[18] This issue determines claim 6, as well as Defendants' First Counterclaim.

United States District Court
Northern District of California

1    (ii)    pervasive use of the BLUE BOTTLE BLUE Marks (Pantone 2995 C);

2    (iii)    a silhouette of product shown predominantly;

3    (iv)    a silhouette of product shown in white and blue color combination; and

4    (v)    square-shaped product packaging.

5    FAC ¶ 46.  In discovery, Plaintiff also asserted that "another manner in which Blue Bottle

6    uses its trade dress is the unique combination of (i) 'Blue'-formative wording (including,

7    without limitation, 'Blue Bottle') and/or (ii) the BLUE BOTTLE BLUE Marks (Pantone

8    2995 C)."  Objections to Second Supp. Response to Interrogatory 1 at 8.  When asked what

9    he considers to be the protectable elements of Blue Bottles trade dress, Cha testified that it

10   would be the "Pantone Blue" and the "word mark, Blue Bottle."  de Gyarfas Decl. Ex. E at

11   145:9–14.

12         Defendants argue that Blue Bottle's description of its trade dress is "confused and

13   inconsistent" and so the trade dress claim fails as a matter of law because it must be

14   claimed with "particularity."  D MSJ at 22.  Defendants cite to Homeland Housewares,

15   LLC v. Euro-Pro Operating LLC, No. CV 14-03954 DDP (MANx), 2014 WL 6892141, at

16   *3 (C.D. Cal. Nov. 5, 2014), where the court granted a motion to dismiss because the

17   plaintiffs had not "sufficiently described their claimed trade dress."  Id.

18         Blue Bottle responds in two ways.  First, Blue Bottle argues that Defendants should

19   have raised this issue in a motion to dismiss.  P Opp'n at 19 (citing Fed. R. Civ. P. 12(b)

20   ("Every defense to a claim for relief in any pleading must be asserted in the responsive

21   pleading if one is required.")).  Second, Blue Bottle argues that it adequately identified the

22   elements of its trade dress claim because it merely had to put Defendants on notice of that

23   claim.  Id.

24         The Court assumes for present purposes that Defendants can raise the identification

25   issue at this stage.  And it concludes that Blue Bottle has adequately identified the

26   elements of its trade dress.  Defendants cite no authority that uses the word "particularity."

27   See D MSJ at 22.  Rather, Defendants cite to cases where plaintiffs failed to identify

28   concrete elements of its trade dress.  See id. (citing to Yurman Design, Inc. v. PAJ, Inc.,

47

262 F.3d 101, 114 (2d Cir. 2001) (plaintiff's trade dress claims failed as a matter of law because it "never identified the elements that make up its trade dress."); Homeland Housewares, LLC, 2014 WL 6892141, at *3 (only description of the plaintiffs' trade dress was the "color scheme, fonts, phraseology, and overall look and feel of [p]laintiffs' product packaging.") (internal quotations omitted)).

Blue Bottle provided a concrete list of five trade dress elements in the complaint. See FAC ¶ 46. "[C]ourts in this circuit have required trade dress plaintiffs, at the very least, to provide adequate notice by including in their complaint 'a complete recitation of the concrete elements of [their] alleged trade dress.'" Arcsoft, Inc. v. Cyberlink Corp., 153 F. Supp. 3d 1057, 1069–70 (N.D. Cal. 2015) (quoting Lepton Labs, LLC v. Walker, 55 F. Supp. 3d 1230, 1240 (C.D. Cal. 2014)). While Blue Bottle has somewhat confusingly identified its trade dress both as a list of five elements, and as "two core elements," see P Opp'n at 21, Blue Bottle has adequately identified its trade dress, putting Defendants on notice of its claim. See FAC ¶ 46.

### 2.    Functionality

The two types of functionality are "'utilitarian functionality,' which is based on how well the product works, and 'aesthetic functionality,' which is based on how good the product looks." Blumenthal Distrib., Inc. v. Herman Miller, Inc., 963 F.3d 859, 865 (9th Cir. 2020). "If the claimed trade dress has either type of functionality, it is unprotectable." Id. Defendants only raise the issue of utilitarian functionality. See D MSJ at 23. "A claimed trade dress has utilitarian functionality if it is essential to the use or purpose of a product or affects its cost or quality." Blumenthal Dist., 963 F.3d at 965. The Ninth Circuit considers four factors to assess utilitarian functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." Disc Golf Ass'n, Inc., 158 F.3d at 1006.

Blue Bottle conceded that its square-shaped packaging and the product silhouette on

1   the packaging both have utilitarian ██████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ██████████████████████████████████, and the box protects the product inside

4   from damage, ██████████ de Gyarfas Decl. Ex. E at 70:22–71:5.  Those elements are

5   clearly functional.  But "[i]n determining functionality, a product's trade dress must be

6   analyzed as a whole." Int'l Jensen, 4 F.3d at 823.  In addition, "[t]he fact that individual

7   elements of the trade dress may be functional does not necessarily mean that

8   the trade dress as a whole is functional; rather, 'functional elements that are separately

9   unprotectable can be protected together as part of a trade dress.'" Clicks Billiards, Inc. v.

10   Sixshooters Inc., 251 F.3d 1252, 1259 (9th Cir. 2001) (emphasis in original) (quoting

11   LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 76 (2d Cir. 1985)).

12         Defendants do not address whether the "core elements" of Blue Bottle's trade dress

13   that Blue Bottle has emphasized in this briefing—the word "blue" and the BLUE BOTTLE

14   BLUE color, see P Opp'n at 22—are also functional.[19]  And Blue Bottle attempts to point

15   to testimony of its expert, Jeffrey Andrien, that those elements do not provide any

16   utilitarian advantages, which it asserts "creates a genuine dispute on this issue." See id. at

17   22 (citing Young Decl. Ex. 8 (dkt. 185-1) ¶ 12.  Frustratingly, Exhibit 8 to the Young

18   Declaration is Liao's email exchange with the designer about the Blue Brew logo, not any

19   testimony by Andrien.  At the Court's request, Blue Bottle has now filed an Errata, which

20   states that "the correct citation to the Andrien Report is Dkt. 159-5, instead of Dkt. 185-1

21   Ex. 8."  Errata at 1.  The Court now observes, ████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   ██████████████████████ This testimony is sufficient to create a dispute of fact as

26   to functionality.  See Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd., 668 F.3d 677,

27

28   ―――――――――――――――
[19] Defendants' arguments about functionality are very cursory, see D MSJ at 23; D Reply at 14.

683 (9th Cir. 2012) (functionality "is a question of fact"), abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179 (9th Cir. 2016) (en banc). Moreover, given Defendants' failure to even discuss those elements, the Court is not persuaded that Defendants should prevail as to functionality.

### 3.    Secondary Meaning

"In order to qualify for protection under Section 43(a), [trade dress] must also have acquired secondary meaning." Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837. 843. Trade dress "attains secondary meaning when the purchasing public associates the dress with a particular source." Id. "Whether a particular trade dress has acquired secondary meaning is a question of fact." First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir. 1987).

Defendants very briefly argue that the Blue Bottle trade dress lacks secondary meaning. See D MSJ at 23; see also D Reply at 14–15. They contend that the BLUE BOTTLE BLUE color and the BLUE BOTTLE word mark lack secondary meaning because "survey evidence shows that this color has not achieved secondary meaning." Id. (citing de Gyarfas Decl. Ex. H) (Harper Expert Secondary Meaning Survey Report). They also assert that Blue Bottle "has not put forward any evidence that [the BLUE BOTTLE BLUE color] combined with the BLUE BOTTLE word marks create an association in the mind of consumers between those elements and Plaintiff or its products." Id.

The Court is not persuaded that the Blue Bottle trade dress lacks secondary meaning. As discussed above, in light of the media coverage of Blue Bottle, significant advertising by Blue Bottle, and Blue Bottle's substantially exclusive use of the BLUE BOTTLE BLUE Marks for over twenty years, Blue Bottle has met its burden on secondary meaning for the BLUE BOTTLE BLUE Marks.[20] Moreover, Defendants did not even

---

[20] Blue Bottle also responds that it "challenged the Harper Secondary Meaning Report through the expert rebuttal report of Robert Wallace." P Opp'n at 24 (citing dkt. 149-4). But Blue Bottle does not discuss what Wallace said in that report, and the Court need not dig back through the docket to figure that out on its own. See Calence, LLC v. Dimension Data Holdings, PLC, 222 F. App'x 563, 566 (9th Cir. 2007) ("district court did not abuse discretion in refusing to consider the argument contained in prior briefing" which party

United States District Court
Northern District of California

1    challenge the secondary meaning of the BLUE BOTTLE Marks, and two of those marks

2    have become incontestable, which means that they are "conclusively presumed to have

3    acquired secondary meaning."  See KP Permanent Make-Up, Inc., 408 F.3d at 606.  Also,

4    while Blue Bottle has not addressed the secondary meaning of the combined word and

5    color marks, Defendants do not point to any authority requiring that.

6          The Court is not persuaded that Defendants should prevail as to secondary meaning.

7                **4.**       **Likelihood of Confusion**

8          Although the Court is not persuaded by Defendants' first three arguments on trade

9    dress, it is persuaded as to likelihood of confusion.  Again, the controlling authority on this

10    issue is Sleekcraft.  See Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC, 741 F.

11    Supp. 2d 1165, 1177–78 (C.D. Cal. 2010).  The Court's analysis of most of the factors is

12    the same as with the BLUE BOTTLE Marks and the BLUE BOTTLE BLUE Marks, as

13    one would expect, given that courts are to analyze those marks as they are encountered in

14    the marketplace.  See Network Automation Inc., 638 F.3d at 1150).

15          As to the strength of the Blue Bottle trade dress, "[t]he strength of a mark rests on

16    its distinctiveness, which is 'related to the question of secondary meaning.'"  Mattel, Inc.

17    v. MGA Entmt., Inc., 782 F. Supp. 2d 911, 1008 (C.D. Cal. 2011) (quoting Autota World,

18    Inc. v. Ty Inc., 719 F. Supp. 2d 1115, 1158 (C.D. Cal. 2009)).  As discussed above, the

19    Court is not persuaded that Defendants should prevail as to secondary meaning; the Blue

20    Bottle trade dress is relatively strong.

21          As to similarity, though, there are significant differences between the parties' trade

22    dress.  While both parties' packaging uses the word "blue," the size, font, and style of the

23    word is different in the BLUE BOTTLE Marks and the BLUE BREW Mark, as discussed

24    above, and of course the "blue" in the BLUE BOTTLE Mark is followed by "bottle" and

25    "coffee," while the "blue" in the BLUE BREW Mark is followed by "brew."  Compare

26

27    "attempted to incorporate by reference . . . in violation of local page limits."); Swanson v.
       U.S. Forest Service, 87 F.3d 339, 345 (9th Cir. 1996) ("incorporation of substantive

28    material by reference is not sanctioned by the federal rules . . . and the district court did not
       abuse its discretion in striking the incorporations.").

FAC Ex. 2 and FAC Ex. 8.  The Blue Bottle trade dress makes pervasive use of the BLUE BOTTLE BLUE color, along with lots of white,[21] while Defendants' trade dress largely uses Defendants' different, light blue color, with no white aside from the font, and the darker purple-blue of the cornflower.  See de Gyarfas Decl. Ex. 31.  The parties' trade dress is shown here:



Id.  As Defendants point out, the image of a solid blue bottle is a consistent feature of Blue Bottle's packaging, and is not on Defendants' packaging, just as Defendants' large cornflower is not on Blue Bottle's packaging.  See D MSJ at 24.  Blue Bottle's packaging is spare and minimalist; Defendants' is not.  See de Gyarfas Decl. Ex. D at 74:11–16 (answering in the negative to the question, "would you consider that to be—with this splotch and the words all over the place, would you consider that to be a minimal design?"); FAC Ex. 8; de Gyarfas Decl. Ex. E at 82:20–83:12 (big, dark blue cornflower is not minimalist).  Blue Bottle identifies a silhouette of the product within its packaging "shown predominantly" as a core element of its trade dress, see quoting FAC ¶¶ 46), as is evident in the image above (taking up an entire panel of the box, on a white background, with blue lines), while it is a very small part of Defendants' packaging (in the corner of a panel of the box taken up largely by the Blue Brew Mark and a cornflower, with a blue

_____

[21]

United States District Court
Northern District of California

background and white lines).  Also, that both parties sell their products in boxes is not especially novel.  The trade dress is not similar.

As to proximity of the goods and similarity in marketing channels, as stated above, "[b]oth parties sell coffee-related products," D MSJ at 13, and both parties use social media, both seem to primarily sell their products online, and both sell their products on Amazon, P MSJ at 3–4; ███████████████████████; de Gyarfas Decl. Ex. F at 104:23–105:3; Young Decl. Ex. 4 at 125:25–126:10; id. Ex. 32 (dkt. 185-33).

As to the type of goods and degree of care, as stated above, although the goods are not terribly expensive, there is reason to believe that the buyer will exercise some care. See RJN Ex. 171 at 6–7 ("Applicant's consumers are highly sophisticated third wave coffee consumers who exercise care in purchasing their coffee products and related goods.").  As to intent, as stated above, Blue Bottle witnesses admitted that they were not aware of any evidence of intentional copying, and there is evidence that Liao instructed her designer not to use "blue bottle's blue." See de Gyarfas Decl. Ex. 4.  As to likelihood of expansion, as stated above, there is no evidence that either party will expand its business, and the parties' goods already overlap.

As to actual confusion, as stated above, there is no evidence of actual customer confusion.  See, e.g., de Gyarfas Decl. Ex. V at 15.  Moreover, Defendants' expert, Harper, conducted a study on this subject.  See id. Ex. K (dkt. 184-12).  That "MBA Trade Dress Forward Consumer Confusion Survey" sought to "determine whether, and if so to what degree, relevant consumers confuse the source of [Defendants'] BLUE BREW trade dress as being made by, associated or affiliated with, or received approval or authorization from [Blue Bottle]." Id. ¶ 29.  Of the 350 respondents to the survey, none "answered that [Blue Bottle] manufactures [Blue Brew] or that [Blue Brew] received authorization or approval from [Blue Bottle]." Id. ¶¶ 66–67.  One individual— representing 0.6% of respondents— stated that Blue Bottle was associated/affiliated with Blue Brew because "Blue is in the name." Id. ¶ 67.  Harper therefore concluded that "Defendants' use of BLUE BREW does not create a likelihood of forward confusion with respect to BLUE BOTTLE." Id. ¶ 70.  A

percentage of 0.6%, see id., supports the conclusion that there is no likelihood of confusion, see Newport Pac. Corp., 2006 WL 2811905, at *14.  Moreover, Blue Bottle's challenges to Harper's reports, as stated above, are unpersuasive.

While the Sleekcraft factors are again mixed, the Court is persuaded that the lack of similarity, the lack of intent, and the lack of actual confusion mean that there is not sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible.'"  See M2 Software, Inc., 421 F.3d at 1085.  The Court therefore holds that there is no likelihood of confusion as to the Blue Bottle trade dress.

## IV.    CONCLUSION

The Court recognizes that the Ninth Circuit has "cautioned that 'district courts should grant summary judgment motions regarding the likelihood of confusion sparingly,'" particularly where "a majority of the Sleekcraft factors could tip in either direction."  See BBK Tobacco, 2024 WL 1364300, at *1 (quoting Fortune Dynamic, 618 F.3d at 1039).  Here, though, the Sleekcraft factors cannot "tip in either direction"—some clearly favor Blue Bottle while some clearly favor Defendants.  While the Court's conclusion herein is based on more than a single factor, that the parties' marks are not similar leads the Court to believe that no consumer is likely to be confused.  See Arcona, Inc., 976 F.3d at 1080–81 ("no reasonable consumer would be confused" where "the packaging, size, color, shape, and all other attributes—other than the term 'EYE DEW'— are not remotely similar."); Brookfield Commc'ns, Inc., 174 F.3d at 1054 ("Where the two marks are entirely dissimilar, there is no likelihood of confusion."); Playmakers, 297 F. Supp. 2d at 1282 ("Without similarity, there can be no confusion."); see also BBK Tobacco, 2024 WL 1364300, at *3 (Bumatay, J., concurring in part and dissenting in part) ("The two marks look nothing alike. . . . So there can be no consumer mistake because the marks are, quite simply, not similar.").  That marks that are not similar appear on similar products and in similar marketing channels does not merit a trial.  Accordingly, for all of the foregoing reasons, the Court DENIES Blue Bottle's motion, and GRANTS

//

54

Defendants' motion.

**IT IS SO ORDERED.**

Dated: May 7 , 2024

_____
CHARLES R. BREYER
United States District Judge